# STATE v. JAMES WOFFORD.

114 N. W. (2d) 267.

March 9, 1962—No. 38,171.

*James Wofford,* pro se, for relator.

*Walter F. Mondale,* Attorney General, *George M. Scott,* County Attorney, and *Ronald I. Meshbesher,* Assistant County Attorney, for respondent.

MURPHY, JUSTICE.

This case is before us on a writ of error issued by this court on petition of the defendant, James Wofford, who was convicted of second-degree assault. Minn. St. 619.38. The defendant assigns a number of grounds on which he claims he is entitled to a new trial, the most important of which is that prejudicial error occurred in the reception of evidence which resulted in denial of a fair trial.

From the record it appears that about 1 a. m. on January 15, 1960, Ernest Svoboda, a taxicab driver, was dispatched to the Spinning Wheel Tavern in Minneapolis. He arrived there about 1:15 a. m. and picked up two passengers. After they entered the cab, he switched on the dome light, turned around, and asked them where they wanted to go. They answered that they were new in town but if he would drive down Cedar Avenue they would recognize the place to which they wished to go. The driver then turned off the light and proceeded to follow their directions. At about 1:30 a. m., after taking a circuitous route directed by the passengers, the driver was told to stop at 13th Avenue and 22nd Street. At this point Svoboda switched on the dome light of the cab and turned around to collect his fare. He again had an opportunity to see the faces of his passengers. At that time he saw a gun in the hand of one of the passengers, who was later identified as LaMarr. LaMarr discharged the gun, the bullet entering the driver's shoulder. The driver then jumped from the cab and ran in a westerly direction down 22nd Street. He found cover between two houses, where he hid. The two men, who had followed him, ran past his hiding place. After a short interval, the driver returned to the place where his cab was parked. On his way he hailed a police car which had been dis-

patched to the area as a result of a call from one Rodney Norman, who lived across the street from where the cab had stopped. Norman had heard muffled noises, and, as he looked out his window, he saw the empty cab with both headlights and interior lights on and three men running down the block in the same direction. He then called the police. After the police arrived, they conducted an investigation in which a police dog was used. This dog was trained in the art of tracking human beings. After being given the scent, it proceeded in the direction in which the men were seen to be running and stopped at the back door of a two-floor dwelling located at 2019 11th Avenue South. The apartment in the upper floor of this building was occupied by the defendant, Wofford, and a woman not his wife. At about 2:15 a. m. the police proceeded up the stairway to the second floor and knocked on the door of Wofford's apartment. In the interview that followed, Wofford and his companion claimed that he had been in his room all the previous night and evening. The officers then went to the adjoining bedroom occupied by one Marie Culph and Charles Timberlake and found LaMarr, fully dressed, apparently sleeping on a couch. After looking around, the officers left. In the meantime Svoboda had been taken to the Minneapolis General Hospital and then to Abbott Hospital where a .22-caliber bullet was removed from his right shoulder.

From the testimony of Marie Culph and Charles Timberlake, it appears that sometime between 1 and 2 a. m. Wofford and LaMarr entered the apartment which they occupied. Wofford asked if his friend, LaMarr, could remain in their room for the night. They consented, whereupon LaMarr lay down on the couch and Wofford went next door to his apartment. After the police had left, Wofford returned to Timberlake's apartment and asked Timberlake to hide a gun for him.

On January 21, 1960, the police took LaMarr and Wofford into custody. In a line-up at the city jail they were identified by Svoboda as the two passengers who had assaulted him on the night of January 15, 1960. It also appears from the record that on the night of January 14, 1960, Wofford and LaMarr had met one Ruth Mims at a bar on Washington Avenue in Minneapolis. At their request she gave them a ride in her car to Hallberg's Tavern on Washington

Avenue. Hallberg's Tavern is located about 1 block from the Spinning Wheel Tavern, where Svoboda picked up his passengers on the early morning of January 15. The witness Mims recalled that she dropped off Wofford and LaMarr sometime around midnight. The defendant was tried separately and found guilty.

■ Before sentence was imposed the defendant moved for a new trial on the ground of newly discovered evidence. This motion was based upon an affidavit of Robert LaMarr to the effect that it was not the defendant but one Wiley Green who was with him on the night the assault was committed. In this court defendant also presents the affidavit of Charles Timberlake to the effect that he and his girl friend, Marie Culph, "were induced by Minneapolis Police to testify against James Wofford at his trial and [Marie Culph] was told if she testified against James Wofford, as instructed, by police, it would help me receive probation, as we both testified falsely against James Wofford." In State v. Nelson, 91 Minn. 143, 155, 97 N. W. 652, 657, we said:

"A motion for a new trial based upon the ground of newly discovered evidence is addressed to the sound discretion of the trial court, with the exercise of which this court will never interfere except in the case of plain abuse, and the rule applies in criminal as well as in civil actions. One of the controlling inquiries in determining whether a new trial should be granted on this ground is whether the new evidence, if produced, will be likely to change the result; and unless it has a substantial tendency towards showing the innocence of defendants, a new trial should not be granted."

Because of the doubtful character of the "newly discovered" evidence upon which the motion is based and the particular circumstances of this case, we cannot say that the trial court abused its discretion in denying defendant's motion for a new trial.[1]

■ The defendant next contends that he should be granted a new trial because of prejudicial error in the reception of evidence to the ef-

[1]State v. Nelson, 91 Minn. 143, 97 N. W. 652; State v. Bergeson, 203 Minn. 88, 279 N. W. 837; Vietor v. Costello, 203 Minn. 41, 279 N. W. 743; State v. Upson, 162 Minn. 9, 201 N. W. 913.

fect that he was involved in a robbery committed 10 days before the offense for which he was on trial. The error is predicated upon these facts: During the prosecution the witness Charles Timberlake testified that on the early morning of January 15, 1960, after the police had left the building where he and Wofford lived, Wofford entered his apartment and asked him to hide a gun. The prosecution then inquired if Timberlake had seen LaMarr with a gun on a previous occasion. This line of questioning was objected to by the public defender. The court, however, permitted Timberlake to testify that on or about January 4, 1960, he had seen the gun or one similar to it and that it was given to LaMarr by the defendant Wofford. Up to this point there is no claim of error. However, the prosecution pursued the subject of the events of January 4, 1960, and the witness was permitted to testify that he and two others were involved in a robbery committed on that date; that he was being held in the county jail awaiting trial on a charge growing out of that robbery; and that the defendant and LaMarr were involved in it with him. There was the following testimony on examination by the prosecuting attorney:

"Q   Was that before January 15th, 1960?

"A   I don't know the exact date but it was on this robbery that I am being held in the county jail for.

"Q   That was around January 4th, 1960?

"A   That's right.

"Q   It was before the 15th; and you said there were three people involved in that robbery?

"A   That's right.

"Q   Who was the third man?

"A   There was only two of us that went in the place.

"Q   Who were the two?

"A   Myself and LaMarr.

"Q   Where was the third man?

"A   At home.

"Q   Who was the third man?

"A   James Wofford."

At this point the public defender moved for a mistrial on the ground

that the state had introduced evidence of another and separate crime and that such evidence was so prejudicial as to deny the defendant a fair trial. The motion was denied. In a discussion between counsel and the court which followed in chambers the prosecuting attorney asserted that the evidence relating to Wofford's involvement in the robbery committed on January 4, 1960, was merely incidental to proof of the material fact that he had possession of a gun prior to the date of the commission of the offense with which he was charged.

It is well established that evidence that the accused has committed another crime unrelated and unconnected with the one for which he is on trial is inadmissible since it is not competent to prove one crime by proving another.[2] The general rule is set forth in State v. Sweeney, 180 Minn. 450, 455, 231 N. W. 225, 227, as follows:

"The general rule in a criminal case is that evidence which in any manner shows or tends to show that the accused has committed another crime independent of that for which he is on trial is inadmissible. The reason is obvious and the rule should be rigorously enforced. The rule, however, like most rules, has certain exceptions not to be stated categorically but among which evidence of other crimes is admissible to prove the accusation when it tends to establish (1) motive, (2) intent, (3) absence of mistake or accident, (4) the identity of the accused, (5) sex crimes, (6) a common scheme or plan embracing the commission of similar crimes so related to each other that proof of one or more of such tends to establish the accusation. Such is the common law."

The most recent statement on the subject is set forth in State v. Gress, 250 Minn. 337, 346, 84 N. W. (2d) 616, 623, as follows:

"* * * It is clear from our decisions that facts must exist furnishing proof of a common scheme or plan before the evidence as to related offenses or crimes will be received. Such evidence is ordinarily of such prejudicial nature that in the absence of proof fairly establish-

---

[2]State v. Sweeney, 180 Minn. 450, 231 N. W. 225; State v. Gress, 250 Minn. 337, 84 N. W. (2d) 616; State v. DePauw, 246 Minn. 91, 74 N. W. (2d) 297; State v. Haney, 219 Minn. 518, 18 N. W. (2d) 315.

ing a common scheme, plan, or pattern, the evidence ought not to be admitted. See, State v. Haney, 219 Minn. 518, 18 N. W. (2d) 315; State v. DePauw, 246 Minn. 91, 74 N. W. (2d) 297."

■ It is well recognized that the rule excluding evidence of the commission of other offenses does not necessarily deprive the state of the right to make out its whole case against the accused on any evidence which is otherwise relevant upon the issue of the defendant's guilt of the crime with which he was charged. The state may prove all relevant facts and circumstances which tend to establish any of the elements of the offense with which the accused is charged, even though such facts and circumstances may prove or tend to prove that the defendant committed other crimes. The application of this rule is discussed in State v. Haney, 219 Minn. 518, 520, 18 N. W. (2d) 315, 316, in which it is pointed out that evidence of other offenses may be admissible where such evidence is "relevant and competent to the proof of the offense in issue."[3] Thus, where two or more offenses are linked together in point of time or circumstances so that one cannot be fully shown without proving the other, or where evidence of other crimes constitutes part of the res gestae, it is admissible. In establishing guilt of larceny of one article the state may prove that the accused stole other articles on the same expedition. See, Annotation, 170 A. L. R. 306. Such evidence may be considered only for the purpose for which it is sought to be introduced, regardless of the fact that it may incidentally show commission of some other offense. Such evidence, however, must show a causal relation or connection between the two acts so that they may reasonably be said to be part of one transaction.

The state relies on State v. McClendon, 172 Minn. 106, 214 N. W. 782, and State v. Nichols, 179 Minn. 301, 229 N. W. 99, as authority for the proposition that evidence with relation to possession of the gun at a time prior to the date of the offense with which the de-

---

[3]See, United States v. Segal (D. Minn.) 147 F. Supp. 506; Segal v. United States (8 Cir.) 246 F. (2d) 814, 818; State v. Madigan, 57 Minn. 425, 59 N. W. 490; State v. Rose, 70 Minn. 403, 73 N. W. 177; State v. Ames, 90 Minn. 183, 96 N. W. 330; State v. Reilly, 184 Minn. 266, 238 N. W. 492; State v. Hayward, 62 Minn. 474, 65 N. W. 63.

fendant is charged was relevant in establishing "[t]he previous possession or lack of special means * * * to show the doing or not doing of an act requiring such means." 1 Wigmore, Evidence (3 ed.) § 88. There is no quarrel with the claim that prior possession of the gun or one similar to it had probative value as bearing upon the particular issues in this case. As we understand the cases upon which the state relies, they are authority for the proposition that evidence of prior possession of a gun is not rendered inadmissible merely because it may indicate or have an "incidental tendency" to implicate the defendant in unrelated offenses. They are not authority for the proposition, however, that evidence of prior possession of a gun may be used as a wedge to open the door to proof of the commission of other unrelated offenses.

The evidence of the defendant's involvement in the robbery of January 4, 1960, did not come before the jury incidentally as part of material and relevant evidence it was entitled to consider as bearing upon the issue of the assault charge. It was introduced as an additional fact for the obvious purpose of convincing the jury that one who was involved in a robbery on January 4, 1960, was more likely to be implicated in other felonious conduct committed 10 days later when the assault occurred. If there was any doubt in the minds of the jurors as to the guilt of the defendant, it might be expected that such doubt would vanish upon Timberlake's disclosure that the defendant had been involved with him in the robbery of January 4. We cannot escape the conclusion that this inadmissible evidence was so prejudicial as to deny the defendant a fair trial. In State v. Gress, 250 Minn. 337, 348, 84 N. W. (2d) 616, 624, we said:

"It was made clear in State v. Silvers, *supra,* that, even where the prosecuting attorney asks incompetent or irrelevant questions calculated to prejudice defendant in the eyes of the jury, his conduct constitutes reversible error even though objections thereto are sustained and even though the questions were asked in good faith by the prosecutor. Good faith in asking improper questions is wholly irrelevant to the problem since the rights of an accused will be jeopardized as much by an improper question asked in good faith as by one asked with a vi-

cious purpose. If the effect herein was to prejudice the defendant in her constitutional right to a fair trial, she is entitled to a new trial. Petruschke v. Kamerer, 131 Minn. 320, 155 N. W. 205; State v. Phillips, *supra*; State v. Peterson, 98 Minn. 210, 108 N. W. 6."[4]

█ We have a natural hesitation to reverse a conviction on errors where, as here, the evidence of guilt is strong. Where there is evidence to support the verdict, it should not be disturbed where the errors are of no vital consequence and do not materially affect the substantial rights of the accused. Where, however, the impact of the asserted error is such that it might be expected to substantially prejudice the jury against the defendant, it should not be disregarded on the ground that the record contains sufficient other evidence to sustain the conviction and that if the defendant were retried the same result would follow. Due process in the trial of a criminal case comprehends standards of conduct and procedure which accord with fundamental principles of fairness essential to the concept of justice[5] and requires that the same standards of fairness be observed for the guilty as well as the innocent. In considering whether prejudicial errors occurring at the trial may have affected its outcome, we said in State v. Hutchison, 121 Minn. 405, 409, 141 N. W. 483, 484:

"* * * But to reach the conclusions that the errors were without prejudice we must hold that the guilt of defendant was conclusively proven. This, in effect, is trying defendant in this court, and depriving him of his right to a trial by jury."

█ The state contends, however, that whatever prejudice occurred was corrected by the instruction of the trial court to the effect that:

---

[4]See, also, State v. Fitchette, 88 Minn. 145, 92 N. W. 527; State v. Fournier, 108 Minn. 402, 122 N. W. 329; State v. Haney, 219 Minn. 518, 18 N. W. (2d) 315; State v. Silvers, 230 Minn. 12, 40 N. W. (2d) 630.

[5]State v. Gress, 250 Minn. 337, 84 N. W. (2d) 616; State v. Haas, 69 S. D. 204, 8 N. W. (2d) 569; State v. Moseng, 254 Minn. 263, 95 N. W. (2d) 6. In the Moseng case we said (254 Minn. 272, 95 N. W. [2d] 13): "The aforesaid constitutional provision [Minn. Const. art. 1, § 6] guarantees to every citizen a speedy and public trial by an impartial jury and due process in all criminal cases *whether defendant be innocent or guilty* as charged." (Italics supplied.)

"There was some mention in this case with reference to some complicity in an attempted robbery charge, aside from these prior convictions. In that connection it must be remembered that the defendant is here on this charge of assault in the second degree, and any reference to this complicity in some other offense is in no sense evidence of guilt in this particular case."

We considered the same argument in State v. Reardon, 245 Minn. 509, 513, 73 N. W. (2d) 192, 195, where we observed that it is well recognized that mistakes occur in most trials and, where they do not substantially affect the rights of the parties, it may be expected that the trial court by proper instruction may rely upon the intelligence and restraint of a jury to disregard them.

"* * * Where, however, the impact of the prejudicial remark may be such as to impart to the minds of the jury substantial prejudicial evidence not properly a part of the case, it is taking too much for granted to say its effect can be removed by an instruction from the court. In his concurring opinion in Krulewitch v. United States, 336 U. S. 440, 453, 69 S. Ct. 716, 723, 93 L. ed. 790, 799, Mr. Justice Jackson said: 'The naive assumption that prejudicial effects can be overcome by instructions to the jury, * * * all practicing lawyers know to be unmitigated fiction.' "

The other points raised by the appeal are not of sufficient merit to require discussion.

Reversed and new trial granted.

MR. JUSTICE ROGOSHESKE, not having been a member of the court at the time of the submission, took no part in the consideration or decision of this case.