**STATE of Minnesota, Respondent,**

v.

**Jerome Deon NUNN, Appellant.**

No. CX–96–781.

Supreme Court of Minnesota.

April 10, 1997.

John M. Stuart, Minnesota State Public Defender, Bradford S. Delapena, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey III, Atty. Gen., St. Paul, Michael O. Freeman, Hennepin County Atty., Linda K. Jenny, Asst. County Atty., Minneapolis, for respondent.

## OPINION

PAGE, Justice.

Jerome Deon Nunn (Nunn) was convicted of first-degree murder under Minn.Stat.

§§ 609.185(1), 609.05 and 609.11 (1996), and attempted first-degree murder under Minn. Stat. §§ 609.185(1), 609.05, 609.11, and 609.17, by a Hennepin County jury as a result of the shooting death of Abdul Poe (Poe) and gunshot wounds to John Holmes (Holmes) in the parking lot of the Jug Liquor Store in Minneapolis, Minnesota, on July 22, 1995. Nunn allegedly shot Poe and Holmes because he believed that the two men had stolen money and drugs from his apartment. At trial, Nunn pled not guilty and presented an alibi defense. He now appeals his conviction on two grounds: (1) the trial court committed reversible error by admitting evidence that Nunn was involved in kidnapping and threatening to kill his cousin, Kendra Nunn (K. Nunn); and (2) the trial court committed reversible error by admitting under Minnesota Rules of Evidence 801(d)(1)(B) out-of-court statements of two prosecution witnesses, K. Nunn and Holmes. We affirm Nunn's convictions.

The state's theory of the case was that Nunn shot Poe and Holmes because he believed that they had stolen $20,000 and a pound of marijuana from his apartment. At trial, K. Nunn testified that she, her cousin Nunn, and her three-year-old daughter shared an apartment during early June 1995. On June 2, 1995, Nunn called her at work and asked her if anybody had been at their apartment the previous night and informed her that $20,000 in cash and a pound of marijuana was missing from his room. She told him that she did not know anything about the missing money and marijuana and that no one had been at their apartment the night before, except their cousin "Misty." Later that same day, Nunn again called K. Nunn at work and asked the same question. Again, she told Nunn that she did not know anything about his missing money and marijuana. When K. Nunn got home from work that day, Nunn and four of his friends, Neilyn Wright, "Little Sell," "Henry," and "Oozy" were there loading handguns. Nunn told K. Nunn that he knew that she knew who had his money. K. Nunn responded that she did not know anything. K. Nunn testified that she was not being threatened at the time, but the atmosphere in the apartment was tense.

According to K. Nunn, she left the apartment, went to the bank, and, upon finishing her business at the bank, stopped to see Poe at an apartment building on Broadway. While K. Nunn was standing outside the building, Nunn drove by in a white Lumina, made a U-turn in the street, and stopped near where she was standing. Wright and Little Sell were in the car with Nunn. Poe and his friend Holmes came out of the apartment building and talked to Nunn, who asked them about the missing money and marijuana. Nunn thought Poe and Holmes had stolen the money and marijuana from the apartment because Poe had dated K. Nunn a few times. Both Poe and Holmes denied taking either the money or the marijuana.

K. Nunn saw Nunn again, later that day, at an apartment located a few blocks away from the apartment they shared. Nunn asked K. Nunn to go outside so they could talk about the missing money and marijuana. K. Nunn went out and got into Nunn's car. Wright, Little Sell, and another of Nunn's friends, "Juan," were already in the car. K. Nunn thought Nunn was going to take her back to their apartment; however, Nunn drove to a store, where he bought some duct tape, and then drove to a house, where Little Sell retrieved a gun. Nunn then took K. Nunn for a ride through Theodore Wirth Park. K. Nunn was sitting in the backseat, between Little Sell, who had a gun on his lap, and Wright; Juan sat in the front with Nunn. K. Nunn testified that Wright told her "they were going to tie me up; shoot me with a .45; tie rocks to the bottom of my legs; throw me in the lake or the river, whichever one; that I was going to see heaven and I wasn't going to see my daughter no more." According to K. Nunn, she was not told why they were going to do this, but, during the ride, Nunn asked her about his missing money and marijuana. On cross-examination, K. Nunn admitted that she was not duct-taped, that Nunn never threatened her, and that neither Nunn nor anyone else pointed a gun at her during the ride in the park.

During the ride in the park, K. Nunn told Nunn that Poe had told her that he and

Holmes had broken into a crack head's house earlier that year, "cooked up" some drugs, stole a rug, cleaned up their mess, wiped down their fingerprints, and left the house without detection. She testified that she told Nunn this story because, to her, it seemed similar to the method used by whomever took Nunn's money and marijuana. The names of Poe and Holmes were the only ones K. Nunn gave to Nunn as people who might have taken the money and marijuana. Nunn eventually dropped K. Nunn off at her sister's house. Three days later, on June 5, Nunn told K. Nunn: "You all need to stop playing around or you are all going to get your heads plt."[1] After this incident, K. Nunn moved out of the apartment she shared with Nunn and into her grandmother's house.

In late November 1995, the police sought to interview K. Nunn, who had moved out of state. The police located her in Georgia, traveled there unannounced, conducted an interview, and obtained a subpoena ordering her to appear at Nunn's trial. The interview was tape-recorded and, as transcribed, was 10 pages long. During Nunn's trial, K. Nunn testified with respect to statements she made during that interview. In addition, the interviewing officer, Sergeant Donald Smulski, testified regarding the interview.

Holmes testified that two days after he and Poe talked to Nunn on Broadway, he talked to Nunn on the telephone, and Nunn asked him for his money. Holmes told Nunn that he did not have his money, but Nunn said he did not believe him and told him that if they, Poe and Holmes, did not give him back his money, he was going to be looking for them. After that telephone conversation, neither Poe nor Holmes spoke to Nunn again and tried to avoid him.

According to Holmes, on the evening of July 22, 1995, he, Poe, and a friend, Jay Revels (Revels), drove to a liquor store at 226 West Broadway in Minneapolis to pick up some alcoholic beverages. Poe was driving, Holmes was in the front passenger seat, and Revels was in the back. Poe parked the car in the liquor store parking lot, and they sat in the car, talking about what they were going to buy. They decided that Revels was going to pay for the beverages, and, as Holmes reached to get money from Revels, he heard gunshots. The shots he heard consisted of both "shooting" and "rapidly firing."

Holmes thought that the gunfire lasted one to two minutes. Glass and debris fell into the car, and Holmes felt something hit his back and realized that he had been shot. After the shots stopped, Holmes looked over the car's dashboard and saw two men running away from the car with their backs to him. Holmes testified that one of the men turned around while running and "looked me dead in my eyes," then got into the passenger side of a deep maroon or reddish-colored car parked about 15–20 feet away. Holmes testified that he was absolutely sure that the man who looked him in the eyes was Nunn. The other man entered the driver's side, and the car fled the parking lot, turning right onto Broadway. Holmes then saw that Poe was lying against where the driver's side window should have been and was nonresponsive. Holmes got out of the car, went to the liquor store, and told the people inside to call the police. Holmes then went back to the car and tried to revive Poe.

At the scene, the police found Holmes crying and kneeling next to Poe, holding Poe's hand. Poe had been shot several times and did not have a pulse. When the police arrived, Holmes immediately started yelling and screaming to the police that "Rome had done it."[2] Holmes also told the police that he did not get a good look at the other shooter, but thought that it was Wright. Discharge casings from a 9 mm gun and a .357 caliber semiautomatic gun were found at the scene, but the murder weapons were never recovered.

Holmes was taken to the hospital for gunshot wounds to his back and for injuries to his face and neck from the flying glass. Officer Gearhart rode in the ambulance to the hospital with Holmes, who was crying, dis-

1. "Plt" is evidently slang for "get shot." Presumably, "you all" referred to K. Nunn, Poe, and Holmes.

2. Nunn was nicknamed "Rome," which was short for "Jerome."

traught, and afraid that he might die. Officer Gearhart's report of the incident contained a statement that Holmes told him, en route to the hospital, that he had observed the suspect's car pull into the lot after theirs, and then the driver and passenger got out. Holmes told Officer Gearhart that the driver was Nunn, and the passenger was Wright. Holmes did not give Officer Gearhart any other names. While at the hospital, two homicide detectives talked to Holmes, and Holmes again identified Nunn and Wright as the shooters. As it turned out, Wright could not have been one of the shooters because he was being held in the Ramsey County Jail at the time of the shooting. On July 24, 1995, Holmes gave the police a six-page formal statement in which he again implicated Nunn in the shooting.

Revels testified that he was about to step out of the car when he heard shots. Revels then ducked down and did not get up until he heard a car drive off. Revels testified that he did not see the shooters.

Felicia Bell (Bell) testified that at about 9:30 p.m. on July 22, 1995, she was in her car at the intersection of Broadway and Washington Avenue, waiting for the traffic light to change, when she heard gunshots. She initially ducked down, but then looked over toward a liquor store parking lot that was in front of her on the right and saw a black man standing in the parking lot, shooting at a car with a handgun. Bell testified that she heard a lot of shots and, after the person stopped shooting, he jumped into what she thought was a red car in the parking lot. The shooters' car then left the parking lot and headed down Broadway. She saw two heads in the car. Bell followed the car for about two blocks and got the license plate number. After getting the license plate number, Bell returned to the liquor store and called 911. Bell gave the license plate number and description of the shooters' car to the police when they arrived. A check of the license plate number determined that the car was a red Pontiac Grand Am registered to Nunn's grandmother, Effie Nunn. The police went to Effie Nunn's residence at about 1:30 a.m., but did not find the car there. The police did find the car at Effie Nunn's resi-

dence on August 7, 1995. Its interior had been cleaned, and no fingerprints were found.

Nunn presented an alibi defense, but did not testify at trial. Larhea Nakao (Nakao), Nunn's girlfriend, testified that she lived with Nunn in July 1995, that she had been living with him since August 1994, and that Nunn was not sharing an apartment with K. Nunn in June 1995. She also testified that on the night of July 22 she was approximately eight months pregnant with Nunn's child and was feeling sick from her pregnancy and that she and Nunn spent the evening at home alone. According to Nakao, Nunn left their apartment at 4 p.m. to go to the grocery store and his mother's house, returning around 6:30 p.m. Nunn started cooking dinner when he returned, and Nunn's mother called around 8 p.m. that night. After Nakao and Nunn finished eating dinner around 9 p.m., they watched a movie.

Nunn's mother, Shirley Nunn (S. Nunn), also testified as an alibi witness. S. Nunn testified that she called Nunn at about 7:45 p.m. on July 22 and scolded him for making and leaving a mess at her house earlier in the day. She also testified that she had never seen Nunn drive Effie Nunn's red Pontiac Grand Am and that, at the time of Poe's murder, Nunn was living in Brooklyn Center with Larhea Nakao. The prosecution introduced evidence that, two days after the shooting, S. Nunn told the police that she did not know where Nunn was living and had not seen him for two weeks.

■ In this appeal, Nunn raises two evidentiary issues. Nunn contends that, by admitting K. Nunn's testimony regarding the ride in the park, the trial court admitted "other crimes" evidence in violation of this court's holding in *State v. Wofford,* 262 Minn. 112, 114 N.W.2d 267 (1962) (other crimes evidence generally inadmissible to prove crime for which defendant is on trial). Nunn also contends that the admission of evidence relating to prior consistent out-of-court statements given by K. Nunn and Holmes was grounds for reversal. Rulings on evidentiary matters rest within the sound discretion of the trial court, and this court will not reverse a trial court's evidentiary ruling absent a

clear abuse of discretion. *State v. Ture*, 353 N.W.2d 502, 515 (Minn.1984). On appeal, the defendant has the burden of proving both that the trial court abused its discretion in admitting the evidence and that the defendant was thereby prejudiced. *State v. Steinbuch*, 514 N.W.2d 793, 799 (Minn.1994) (citation omitted). Reversal is warranted only when the error substantially influences the jury's decision. *Id. See also State v. Blasus*, 445 N.W.2d 535, 540 (Minn.1989) (holding that test for whether erroneous admission of prejudicial evidence was harmless is whether there is any reasonable doubt that result would have been different if evidence had been excluded).

█ Specifically, Nunn argues that the trial court erred when it permitted the prosecution to elicit testimony from K. Nunn regarding "the circumstances in which she told appellant that Poe and Holmes might have stolen his property"; that is, "by admitting evidence that appellant and his friends kidnapped Kendra and threatened her with death." Nunn concedes that evidence that he believed that he had been robbed was relevant and was properly admitted. In addition, Nunn concedes that evidence that K. Nunn told him that Poe and Holmes had stolen before in a similar fashion was relevant to show Nunn's alleged motive to shoot Poe and Holmes and was also properly admitted. However, Nunn argues that evidence that he and his friends "kidnapped" [3] K. Nunn and threatened to kill her had no relevance to show Nunn's motive to harm Poe and Holmes. Nunn contends that admission of this evidence was so prejudicial that reversal is required because the evidence made the jury more likely to believe that he shot Poe and Holmes because he had engaged in other criminal activity. Furthermore, Nunn argues that this evidence created a strong negative impression of his character that severely undermined his alibi defense.

█ As a general rule, in a criminal case, evidence showing that the accused has committed another crime unrelated to the crime for which he or she is on trial is inadmissible because it is not competent to prove one crime by proving another. *State v. Wofford*, 262 Minn. 112, 117, 114 N.W.2d 267, 271 (1962). *See also State v. Spreigl*, 272 Minn. 488, 490, 139 N.W.2d 167, 169 (1965). Further, other crimes evidence offered to prove the accused's propensity or disposition to commit crimes is also inadmissible. *State v. Thieman*, 439 N.W.2d 1, 6 (Minn.1989). However, there are exceptions to these rules. Evidence of other crimes by the accused is admissible to prove the crime for which the accused is on trial if the other crime tends to establish: (1) motive; (2) intent; (3) absence of mistake or accident; (4) identity of the accused; or (5) a common scheme or plan. *Wofford*, 262 Minn. at 117, 114 N.W.2d at 271 (citing *State v. Sweeney*, 180 Minn. 450, 455, 231 N.W. 225, 227 (1930)). *See also* Minn.R.Evid. 404(b). In addition, we stated in *Wofford* that:

> [W]here two or more offenses are linked together in point of time or circumstances so that one cannot be fully shown without proving the other, or where evidence of other crimes constitutes part of the res gestae, it is admissible. * * * Such evidence may be considered only for the purpose for which it is sought to be introduced, regardless of the fact that it may incidentally show commission of some other offense. Such evidence, however, must show a causal relation or connection between the two acts so that they may reasonably be said to be part of one transaction.

262 Minn. at 118, 114 N.W.2d at 271–72. By this statement, we recognized that the general rule against admitting other crime evidence should not necessarily preclude the state from "making out its whole case" against the accused based on evidence that may be relevant to the accused's guilt of the crime charged. *Id.* at 118, 114 N.W.2d at 271.

█ It is within the trial court's discretion to determine whether evidence of other

---

3. At trial, neither K. Nunn, the prosecutor, nor Nunn's defense counsel referred to the circum-

stances of the ride in the park as a "kidnapping."

crimes is admissible as an exception to the general rule. *State v. Saucedo,* 294 Minn. 289, 293, 200 N.W.2d 37, 40 (1972). *See also Ture,* 353 N.W.2d at 515 ("Admission of evidence of other crimes rests in the sound discretion of the trial court and will be upheld absent a clear showing of abuse of discretion."). If it is unclear whether or not an exception applies, then the accused receives the benefit of the doubt and the evidence should be excluded. *Saucedo,* 294 Minn. at 293, 200 N.W.2d at 40. In this case, at a pretrial hearing, Nunn's defense counsel made a motion to exclude K. Nunn's testimony regarding the ride in the park. The trial court denied that motion, finding that the circumstances under which K. Nunn implicated Poe and Holmes as possibly having taken Nunn's money and marijuana were admissible under *Wofford.* The trial court determined that those circumstances illustrated how a connection was established between Nunn and the victims and were therefore relevant to Nunn's motive. Further, the trial court believed that the evidence indicated that Nunn had been premeditating the shooting for "a period of time."

The trial court did not abuse its discretion in this case. While we note that the "ride in the park" and accompanying threats were not by themselves the basis for Nunn's motive, the circumstances of the ride were *related* to Nunn's motive because it was under these circumstances that Nunn's belief that Poe and Holmes had taken his money and marijuana was reinforced. In addition, the circumstances surrounding the "ride in the park" were relevant to show the lengths to which Nunn was willing to go to retrieve his money and marijuana and to punish the individuals he believed to be responsible for their disappearance. All of this evidence supported the prosecution's case on motive, which in turn went to the issues of intent and premeditation, which are elements of first-degree murder under Minn.Stat § 609.185. *See Wofford,* 262 Minn. at 118, 114 N.W.2d at 271 ("The state may prove all relevant facts and circumstances which tend to establish any of the elements of the offense with which the accused is charged, even though such facts and circumstances may prove or tend to prove that the defendant committed other crimes."); *see also State v. Drews,* 274 Minn. 426, 430, 144 N.W.2d 251, 254–55 (1966).

Having concluded that K. Nunn's testimony relating to the "ride in the park" was relevant, the next question to be answered is whether the probative value of that evidence is outweighed by its prejudicial effect. *See* Minn.R.Evid. 403. We answer that question in the negative. The ride in the park and the shooting of Poe and Holmes are inextricably linked. The circumstances of the "ride in the park" provided the jury insight into and an understanding of the shooting of Poe and Holmes. Without that evidence, the jury would have been left in the dark as to why Nunn might want to shoot Poe and Holmes. Therefore, we cannot say that the prejudicial effect of the evidence outweighs its probative value. While the potential for the evidence to be prejudicial is high, its probative value is as great, if not greater.

■ Nunn next argues that the admission of K. Nunn's and Holmes' prior consistent out-of-court statements, and the testimony relating to those statements, was reversible error. He bases this argument on his contention that, under Rule 801(d)(1)(B) of the Minnesota Rules of Evidence, a prior consistent out-of-court statement offered solely to corroborate in-court testimony must bear "significant indicia of reliability" in order to be admissible as substantive evidence.

Rule 801(d)(1)(B) provides that a prior consistent out-of-court statement is not hearsay and is admissible as substantive evidence if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * consistent with the declarant's testimony and helpful to the trier of fact in evaluating the declarant's credibility as a witness." The rule, as amended in 1990, was intended to broaden the admissibility of prior consistent out-of-court statements and ensure that such statements are both consistent and helpful to the jury. The rule in place before the 1990 amendment allowed the admission of prior consistent out-of-court statements only if the declarant testified at the trial, was subject to cross-examination concerning the statement, and the prior statement was con-

sistent with the declarant's trial testimony and "offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive." The comments to the amended rule note that this language was too restrictive, and we agree.

We decline Nunn's invitation to read into the rule the requirement that before a prior out-of-court statement can be admitted, the statement must bear "significant indicia of reliability." In reading the rule and the committee comments to the rule, we find no requirement that the prior consistent out-of-court statement bear "significant indicia of reliability." The rule addresses concerns regarding consistency and helpfulness, not reliability. Further, we see no compelling reason to read such a requirement into the rule. The 1990 amendment to Rule 801(d)(1)(B) effectively addresses the concerns raised by the old rule and, at the same time, safeguards remain in place to ensure that the rule is not abused. Under the rule, prior consistent out-of-court statements are not automatically admitted. The statements must be helpful to the trier of fact in evaluating the witness' credibility. Thus, before the statement can be admitted, the witness' credibility must have been challenged, and the statement must bolster the witness' credibility with respect to that aspect of the witness' credibility that was challenged. Finally, under Rules 403 and 611, the trial court retains authority to either limit or exclude the statement and, if admitted, to control the manner in which it is admitted.

Based on our review of the record before us, we conclude that the statements at issue in this case fall squarely within Rule 801(d)(1)(B) and were properly admitted. At trial, K. Nunn and Holmes testified and were subject to cross-examination. Nunn challenged both K. Nunn's and Holmes' credibility by disputing their recollection of the events leading up to and surrounding the shooting of Poe. K. Nunn's and Holmes' prior out-of-court statements corroborated their in-court testimony with respect to those events and were thus helpful to the trier of

fact in evaluating their credibility. Therefore, the trial court did not commit error in admitting the statements.[4]

Because we conclude that the trial court did not abuse its discretion in admitting the "other-crime" evidence under *State v. Wofford* and the prior consistent out-of-court statements under Minn.R.Evid. 801(d)(1)(B), we affirm Nunn's convictions in all respects.

Affirmed.

---

4. We note that even if we were to adopt Nunn's "significant indicia of reliability" requirement for Rule 801(d)(1)(B), our review of the record suggests that K. Nunn's and Holmes' prior consistent out-of-court statements would have been admissible because the statements bear significant indicia of reliability.