*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0869**

Fahad Abdihaim Diriye, petitioner,
Appellant,

vs.

State of Minnesota,
Respondent.

**Filed January 19, 2016
Affirmed
Chutich, Judge**

Scott County District Court
File No. 70-CR-12-19441

Cathryn Middlebrook, Chief Appellate Public Defender, Steven P. Russett, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Ronald Hocevar, Scott County Attorney, Todd P. Zettler, Assistant County Attorney, Shakopee, Minnesota (for respondent)

Considered and decided by Ross, Presiding Judge; Chutich, Judge; and Hooten, Judge.

**UNPUBLISHED OPINION**

**CHUTICH**, Judge

Appellant Fahad Diriye appeals the denial of his petition for postconviction relief.

He asserts that the state failed to prove beyond a reasonable doubt that he committed third-

degree assault. He additionally argues that the district court erred by admitting other-bad-acts evidence regarding his 2011 aggravated-robbery conviction and that it further erred by failing to limit the testimony upon its admission. Because we conclude that the state's evidence was legally sufficient to sustain Diriye's conviction and any asserted errors in admitting testimony did not significantly affect the verdict or affect Diriye's substantial rights, we affirm the district court's denial of postconviction relief.

**FACTS**

This case arises from an assault in a public park. Around 6:00 p.m. on September 17, 2012, the victim, D.B., and his girlfriend, C.G., drove into the parking lot next to the basketball court in the park, where about fifteen young men were playing basketball. D.B. recognized a friend parked next to the court, pulled in beside him, and motioned to another friend on the basketball court to ask for a cigarette.

While D.B. stood next to his friend's car, a man wearing a red hooded sweatshirt approached him with his hand outstretched, as if to offer a handshake. The man attempted to cover his face with his arm and shirt as he walked. When D.B. outstretched his hand, he asked, "Is that Fahad?"

Rather than shake D.B.'s hand, the man punched D.B. in the mouth, causing D.B. to fall to the ground and lose consciousness for five to six seconds. He suffered visible chips to two teeth and internal cracks to another. His injuries resulted in at least $3,000 of dental damage, for which D.B. was uninsured.

D.B. later told police that, when he regained consciousness, his assailant came toward him again and the group of young men playing basketball quickly approached, so

he fled. He ran until he found a passerby with a cellphone and then he called the police. D.B. immediately reported to the police that the man who hit him was appellant Fahad Diriye.

D.B. recognized Diriye because he knew Diriye from high school, and D.B. had informed Burnsville Police of Diriye's role in a 2011 aggravated robbery. In April 2011, D.B. skipped school and joined three friends, including Diriye, believing they were going to smoke marijuana. D.B. testified that, unbeknownst to him, his three companions arranged to sell a cellphone in a nearby parking lot, intending to rob the buyer. When the buyer arrived, D.B.'s companions feigned that the cellphone was stuck in the trunk of their car and used the guise to surround the buyer. D.B. testified that Diriye pressed his finger to the back of the buyer's head, as if he had a gun, and coerced the buyer's cooperation by threatening to shoot him. D.B. fled to a nearby parking ramp to avoid involvement in the crime, and he watched as police responded and arrested Diriye minutes later. Burnsville police called D.B. into the police station later that day, and D.B. gave a statement implicating his three companions. His statement led to the aggravated-robbery charge against Diriye, to which Diriye later pleaded guilty.

The day after the 2012 assault, D.B. contacted Diriye on Facebook, trying to induce Diriye to incriminate himself. D.B. testified that he asked Diriye why Diriye assaulted him and that Diriye responded by threatening to assault him again if he "took it to court." This particular statement, however, did not appear in the ten-page printout of their Facebook conversation that was introduced into evidence at trial. Diriye denied knowledge of the

3

assault throughout their Facebook conversation and ultimately insisted that D.B.'s "joke" had gone too far.

At the police station the evening after the assault, D.B. and C.G. identified Diriye as the assailant from a photo lineup of six possible suspects. In their respective identifications, D.B. was one-hundred-percent certain and C.B. was fifty-percent certain of the assailant's identity.

The state charged Diriye with third-degree assault. *See* Minn. Stat. § 609.223, subd. 1 (2014). Before trial, the state filed notice of its intent to admit the details of the 2011 aggravated robbery as other-bad-acts evidence. *See* Minn. R. Evid. 404(b); *State v. Ness*, 707 N.W.2d 676, 685–86 (Minn. 2006) (noting the five-step process required to introduce other-bad-acts, or *Spreigl*, evidence). At a pretrial hearing, Diriye opposed admission of the 2011 aggravated robbery, and the district court ruled it admissible.

At trial, the assailant's identity was the central issue. In their respective testimony, D.B. and C.G. identified Diriye as the assailant, and C.G. testified that she was now one-hundred-percent certain of his identity. The state's trial strategy relied heavily on establishing Diriye's motive for the assault: D.B.'s implication of Diriye in the 2011 aggravated robbery. Through testimony from D.B. and a Burnsville Police Officer, the state elicited the specific facts of how the 2011 aggravated robbery was committed.

The defense argued that D.B. fabricated his assailant's identity to ensure that he recouped the cost of his dental injuries. Diriye called two witnesses to testify that he was not the assailant. The first, Diriye's friend S.I., testified that Diriye was not at the park that day. The second, Diriye's acquaintance A.M.O., testified that he was sitting in a parked

4

car near where the assault occurred and that the assailant had a totally different body type than Diriye.

The jury convicted Diriye and the district court sentenced him to eighteen months in prison, stayed for five years and subject to terms of probation. In response to a probation violation in November 2013, the district court executed Diriye's sentence, which he has now completed. In February 2015, Diriye filed a petition for postconviction relief, which the district court denied. Diriye appeals.

### DECISION

### I.     Sufficiency of the Eyewitness Identification Evidence

In assessing whether the evidence was sufficient to support a finding of guilt, this court "determine[s] whether the legitimate inferences drawn from the facts in the record would reasonably support the [factfinder's] conclusion that the defendant was guilty beyond a reasonable doubt." *State v. Pratt*, 813 N.W.2d 868, 874 (Minn. 2012). "The weight and credibility of the testimony of individual witnesses [are] for the jury to determine." *State v. Moore*, 438 N.W.2d 101, 108 (Minn. 1989) (citing *State v. Engholm*, 290 N.W.2d 780, 784 (Minn. 1980)). We assume that the factfinder believed the state's witnesses and disbelieved contrary evidence. *Id.* We will not disturb the finding of guilt if the factfinder, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offense. *Bernhardt v. State*, 684 N.W.2d 465, 476–77 (Minn. 2004).

A conviction may rest on the testimony of a single credible witness; a single witness's identification testimony is sufficient if the witness testifies that the defendant is the person he or she saw commit the crime. *State v. Miles*, 585 N.W.2d 368, 373 (Minn. 1998). When a single eyewitness's identification of an offender results from only fleeting or limited observation, however, corroboration of the eyewitness's identification may be required. *State v. Spann*, 287 N.W.2d 406, 407–08 (Minn. 1979); *see also State v. Walker*, 310 N.W.2d 89, 90 (Minn. 1981).

Diriye argues that the eyewitness identifications by D.B. and C.G. were unreliable because the assailant wore a hoodie and covered his face as he approached D.B. Diriye contends that, because their identification testimony was unreliable, some independent corroboration was required to sustain his conviction. His arguments are not persuasive.

Sufficient evidence shows that the eyewitness identifications were neither fleeting nor limited, so as to require corroboration. The two witnesses' testimony at trial shows that they each had a meaningful opportunity to see the assailant, despite the assailant's efforts to obscure his face. C.G. testified that she was one to two feet from the assailant when she saw him and he came between her and D.B. to hit D.B. The assailant came within arm's reach of D.B., and D.B. testified that he knew it was Diriye right away when the assailant approached. The assailant lowered his arm before hitting D.B., and D.B. saw the assailant's face before being struck. D.B. saw the assailant again when he regained consciousness because the assailant was standing over him while D.B. was on the ground.

When police responded to the assault, D.B. immediately identified Diriye as the assailant, and he told them that Diriye had likely assaulted him in retaliation for his

6

statements to police incriminating Diriye in the 2011 aggravated robbery. D.B. described Diriye as "a taller, slender black man," approximately 6'4" or 6'5." C.G. similarly described the assailant to police as "tall, pretty dark-skinned, Somali." At the photo line-up, each independently identified Diriye as the assailant.

The eyewitnesses' testimony shows that their identifications were reliable. Accordingly, we need not reach Diriye's corroboration argument. Because two eyewitnesses identified Diriye as the assailant, the evidence was legally sufficient to sustain his conviction.

## II.     Admission of Facts Underlying 2011 Aggravated-Robbery Conviction

Diriye challenges the district court's evidentiary ruling to admit the underlying facts of his 2011 aggravated-robbery conviction. He contends that the district court mistakenly relied upon this court's decision in *State v. Hollins* to find the evidence admissible. *See* 765 N.W.2d 125, 131–32 (Minn. App. 2009). He further maintains that, although the evidence that Diriye had been convicted of, and knew D.B. implicated him in, the 2011 aggravated robbery was properly admitted, the district court erred by allowing the state to elicit extraneous prejudicial facts about the commission of the 2011 aggravated robbery. He urges that, because he objected to admission of the underlying facts in the pre-trial hearing, this court should review the evidentiary ruling under a harmless-error standard. He asserts that, regardless of the standard of review, however, the district court's evidentiary errors entitle him to a new trial. As shown below, his arguments are unavailing.

### 1. *Pre-Trial Evidentiary Ruling*

This court reviews the district court's evidentiary ruling for abuse of discretion. *Ness*, 707 N.W.2d at 685. An appellant contesting the admission of evidence "has the burden to show the admission was both erroneous and prejudicial." *State v. Riddley*, 776 N.W.2d 419, 424 (Minn. 2009). "When the district court has erroneously admitted other-acts evidence, [appellate courts] must determine whether there is a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict." *Ness*, 707 N.W.2d at 691.

Minnesota adheres to the rule generally excluding evidence connecting a defendant with other crimes, except for the purposes of impeachment if he takes the stand on his own behalf. *State v. Spreigl*, 272 Minn. 488, 490–91, 139 N.W.2d 167, 169 (1965). "This general exclusionary rule is grounded in the defendant's constitutional right to a fair trial." *Ness*, 707 N.W.2d at 685. Although this type of evidence, other-bad-acts evidence, "is often probative, it also carries a great likelihood of inflaming passions and resulting in unfair prejudice." *Riddley*, 776 N.W.2d at 424. With proper regard for the caution surrounding this type of evidence, "evidence of other crimes, wrongs, or bad acts may be admitted only for limited, specific purposes." *Ness*, 707 N.W.2d at 685.

#### A. Admissibility as "Intrinsic" or Immediate-Episode Evidence

One such exception to the general exclusionary rule, the immediate-episode exception, permits admission of evidence of bad acts if "two or more offenses are linked together in point of time or circumstances so that one cannot be fully shown without

8

proving the other, or where evidence of other crimes constitutes part of the res gestae." [1]

*Riddley*, 776 N.W.2d at 425 (noting narrow immediate-episode exception). Immediate-episode evidence is admissible "when there is a close causal *and* temporal connection between the prior bad act and the charged crime." *Id.* at 425–26 (citing cases illustrating the "connection required to satisfy the narrow immediate-episode exception to the general character evidence rule") (emphasis added). In *State v. Nunn*, for example, the Minnesota Supreme Court found that testimony regarding a kidnapping that occurred less than two months before the charged murder was immediate-episode evidence because the defendant obtained information during the kidnapping that motivated the charged murder. 561 N.W.2d 902, 907–08 (Minn. 1997).

In line with the immediate-episode exception, this court has held that other-bad-acts evidence that is "intrinsic" to the charged crime is admissible as an exception to the general exclusion. *Hollins*, 765 N.W.2d at 131–32. In *Hollins*, this court held that other-bad-acts evidence is intrinsic to the charged crime if:

> (1) the other crime arose out of the same transaction or series of transactions as the charged crime, and (2) either (a) the other crime is relevant to an element of the charged crime, or (b) excluding evidence of the other crime would present an incoherent or incomplete story of the charged crime.

---

[1] Res gestae means "the events at issue or others contemporaneous with them." Bryan A. Garner, *Garner's Dictionary of Legal Usage*, 777 (3d ed. 2011). In evidence law, res gestae is "a rule of relevance that makes testimony about the events forming part of the res gestae admissible." *Id.* at 778.

*Id.* at 132. Published in 2009, *Hollins* is the only Minnesota case to create an intrinsic-evidence exception, under which other-bad-acts evidence is admissible without a rule 404(b) analysis. *See id.* at 131–32.

Here, the state argued this evidence was admissible as intrinsic evidence under *Hollins* because the 2011 aggravated-robbery episode was "inextricably intertwined" with the charged offense. *See id.* (relying on "inextricably intertwined" federal caselaw). Accepting the state's *Hollins* theory, the district court ruled that the 2011 aggravated-robbery conviction was admissible. We disagree with the district court's ruling on this ground.

First, despite using the language of "intrinsic" evidence, *Hollins* appears to simply reiterate and refine the immediate-episode exception, which is well established in Minnesota evidentiary jurisprudence. *See Riddley*, 776 N.W.2d at 425–26 (noting the history of immediate-episode exception). The supreme court's line of cases applying the immediate-episode exception predates *Hollins* and illustrates that the two exceptions serve nearly identical purposes. *Id.* (citing *Nunn*, 561 N.W.2d at 907–08; *State v. Darveaux*, 318 N.W.2d 44, 48 (Minn. 1982) (holding that evidence of drugs found in the defendant's purse two days after drug store robbery was admissible as immediate-episode evidence where the drugs were the same type of drugs stolen from the drug store); *State v. Leecy*, 294 N.W.2d 280, 282 (Minn. 1980) (explaining that testimony about earlier threats is immediate-episode evidence because the earlier threats escalated into the charged assault); and *State v. Martin*, 293 Minn. 116, 128, 197 N.W.2d 219, 226–27 (1972) (concluding that the district court properly admitted testimony regarding earlier robberies committed by the

defendant because the defendant's desire to conceal the earlier robberies motivated the charged murder)).  Second, since *Hollins* was decided in 2009, the supreme court has clarified that, absent a temporal and causal connection, immediate-episode evidence is not admissible merely to complete the story of the crime.  *Riddley*, 776 N.W.2d at 425 n.3.

Further, regardless of whether the 2011 aggravated robbery was admitted under the *Hollins* intrinsic-evidence exception or under the established immediate-episode exception, its admission under either rationale was improper.  This court has consistently applied *Hollins* to uphold admission of evidence of uncharged crimes closely connected in time and space to the charged crime.[2]  While all of our cases following and applying *Hollins*

---

[2] *See State v. Ogris,* No. A14-1008, 2015 WL 1959867 (Minn. App. May 4, 2015) (finding no plain error resulted from admission of evidence that the appellant committed indecent exposure and stole a backpack the day of the charged offense), *review denied* (Minn. July 21, 2015); *State v. Porte*, No. A14-0883, 2015 WL 1401519 (Minn. App. Mar. 30, 2015) (finding no plain error resulted from admission of evidence that the appellant purchased a car with money and crack cocaine before being arrested for a controlled-substance offense), *review denied* (Minn. June 16, 2015); *State v. Diggs*, No. A13-2354, 2015 WL 404453 (Minn. App. Feb. 2, 2015) (finding no plain error resulted from admission of evidence that the appellant sexually assaulted a minor before forcing her to engage in prostitution in a sex-trafficking prosecution), *review denied* (Minn. Apr. 14, 2015); *State v. Gustafson*, No. A12-1293, 2013 WL 4404241, at *3–4 (Minn. App. Aug. 19, 2013) (finding no plain error resulted from admission of evidence of "general hooliganism" and three uncharged thefts in a racketeering prosecution), *review denied* (Minn. Oct. 23, 2013); *State v. Nelson*, No. A12-1037, 2013 WL 3155409, at *5 (Minn. App. June 24, 2013), *review denied* (Minn. Sept. 17, 2013) (upholding admissibility of evidence of the complainant's restraining order against the appellant in a stalking prosecution); *Bresnahan v. State*, No. A10-1146, 2011 WL 500063, at *4 (Minn. App. Feb. 15, 2011) (noting that evidence of events surrounding appellant's sexual assault and burglary offenses was intrinsic to the charged crime); *State v. McKay*, No. A09-1827, 2010 WL 3958429, at *2–3 (Minn. App. Oct. 12, 2010)(upholding admissibility of evidence that witness told victim that appellant had a gun and wanted to kill the victim); *State v. Scheer*, No. A08-2043, 2009 WL 3735797, at *2 (Minn. App. Nov. 10, 2009) (upholding admissibility of evidence that appellant gave police a false name when he was arrested for the charged offense).

are unpublished and are not precedential, they persuasively show that the *Hollins* intrinsic-evidence exception only applies to uncharged conduct that is closely connected temporally and conceptually to the charged crime. Since the 2009 publication of *Hollins* establishing the definition of intrinsic evidence, we can find no case relying on *Hollins* to admit evidence of a previous *conviction*. Moreover, the 2011 aggravated robbery does not share the necessary temporal connection with the charged offense; the two offenses occurred over seventeen months apart. Without this temporal connection, the 2011 aggravated robbery is neither immediate-episode nor intrinsic evidence.

### B. Admissibility as *Spreigl* Evidence

The state alternatively argued that the 2011 aggravated robbery conviction was admissible as *Spreigl* evidence. Although the district court did not rely on this reasoning, we agree.

Evidence of other bad acts may be admissible for the limited purpose of "showing motive, intent, knowledge, identity, absence of mistake or accident, or a common scheme or plan." Minn. R. Evid. 404(b); *see also Ness*, 707 N.W.2d at 685. Such evidence may not be introduced if its tendency to unfairly prejudice the factfinder substantially outweighs its probative value. *Ness*, 707 N.W.2d at 685. Moreover, if the admissibility of such evidence is a "close call," it should be excluded. *Id.*

"A number of procedural requirements and safeguards govern the admission, presentation, and consideration of other-crime evidence." *State v. Bolte*, 530 N.W.2d 191, 196 (Minn. 1995). The supreme court has developed a five-step process to determine

12

admissibility of other-bad-acts evidence. *Ness*, 707 N.W.2d at 685–86. Under this process,

> [c]ourts examine five factors in deciding whether to admit such evidence: (1) whether the state has given "notice of its intent to admit the evidence"; (2) whether the state has "clearly indicate[d] what the evidence will be offered to prove"; (3) whether there is "clear and convincing evidence that the defendant participated in the prior act"; (4) whether the evidence is "relevant and material to the state's case"; and (5) whether the probative value of the "evidence is outweighed by its potential prejudice to the defendant."

*State v. Clark*, 738 N.W.2d 316, 345 (Minn. 2007) (quoting *Ness*, 707 N.W.2d at 685–86).

Finally, the district court "should give an appropriate cautionary instruction both upon receipt of the other-crime evidence and as part of the final instructions, even if not specifically requested to do so by defense counsel." *Bolte*, 530 N.W.2d at 197 (Minn. 1995). Failure to comply with certain *Spreigl* requirements can result in reversible error and a new trial. *See Spreigl*, 272 Minn. at 490, 139 N.W.2d at 169.

Under the required procedure in the instant case, the state fulfilled steps one and two before trial, and because the evidence involved a conviction, step three was fulfilled. *See State v. Blom*, 682 N.W.2d 578, 601 (Minn. 2004) (holding that defendant's conviction was clear and convincing evidence of prior incident). Regarding step four, the district court appropriately reasoned that the 2011 aggravated-robbery conviction was relevant to the issue of Diriye's motive to commit the 2012 assault. Concerning step five, the district court conducted no analysis of potential prejudice to the defendant before ruling the episode to be admissible. Although the district court provided a final cautionary

13

instruction,[3] the transcript shows that the district court gave no cautionary instruction upon receipt of two witnesses' testimony regarding the 2011 aggravated robbery.

While we agree that evidence of the conviction itself was admissible for the limited purpose of showing Diriye's motive, the district court did not accord Diriye all of the procedural safeguards required to admit it as *Spreigl* evidence. The district court improperly ruled the evidence admissible as intrinsic evidence and, relying on *Hollins*, subsequently omitted a *Spreigl* prejudice analysis and failed to give cautionary instructions upon receipt of the evidence. *See Hollins*, 765 N.W.2d at 131–32 (noting that a *Spreigl* analysis is unnecessary if the evidence of another crime is intrinsic to the crime charged). Accordingly, the district court abused its discretion.

We conclude, however, that the incorrectly admitted evidence of the 2011 aggravated-robbery conviction did not significantly affect the verdict. Diriye concedes on appeal that "evidence that Diriye had been convicted of and knew D.B. had implicated him in the April 2011 robbery was properly admitted." This concession, by itself, substantially lessens any prejudice to Diriye's substantial rights because the jury was inevitably going

---

[3] The court's cautionary instruction read as follows:

> The State introduced evidence of an occurrence on April 5, 2011, in Burnsville, Minnesota. This evidence was offered for the limited purpose of assisting you in determining whether the Defendant committed those acts for which he is charged in this complaint. The Defendant is not being tried for and may not be convicted for any offense other than the charged offense. You are not to convict the Defendant on the basis of the occurrences of April 5, 2011. To do so might result in unjust double punishment.

14

to hear some evidence of his involvement in a 2011 aggravated robbery. Because admission of the conviction itself did not affect the verdict, Diriye is not entitled to a new trial on this ground. Thus, we turn to Diriye's second argument regarding the scope of the prior-crime evidence.

### 2. *Scope of the Challenged Testimony*

Once other-bad-acts evidence is admitted, the defendant bears the burden of challenging its *scope*. *State v. Washington*, 693 N.W.2d 195, 204 (Minn. 2005) (noting appellant's concession that certain other-bad-acts evidence may have been relevant due to similarities). When a defendant has not objected contemporaneously to the manner in which other-bad-acts evidence is presented, the supreme court has expressed reluctance to second-guess the district court's discretion. *Ture v. State*, 681 N.W.2d 9, 16 (Minn. 2004) (faulting the defendant's failure to object when the contested testimony was introduced and holding that the district court did not abuse its discretion by allowing the state to present 24 witnesses who testified for three days of a 12-day murder trial about the details of other-bad-acts evidence involving another murder). When the record demonstrates that the district court had no advance opportunity to consider the contested aspect of the other-bad-acts testimony, the supreme court reframes the issue as whether the district court failed to sua sponte strike the contested testimony or to provide a cautionary instruction. *State v. Vick*, 632 N.W.2d 676, 685 (Minn. 2001).

The supreme court considered a challenge to the scope of *Spreigl* evidence testimony in *State v. Washington*. 693 N.W.2d at 204. Washington had been charged with ten counts of criminal sexual conduct involving a person younger than 18 years old. *Id.* at

198. The district court permitted *Spreigl* evidence involving Washington's convictions for third-degree criminal sexual conduct with a 15-year-old girl and witness tampering arising out of a single incident. *Id.* at 198-99. On appeal, Washington conceded "some similarities" between the prior and charged acts, but "argue[d] that the district court should have excluded testimony of extraneous prejudicial facts," including that the girl "was forced to work as a prostitute, that Washington cut her throat, that she contracted a pelvic disease, and that Washington's actions were responsible for her infertility." *Id.* at 204.

Although the supreme court agreed that the "testimony should have been limited to exclude elements not needed or relevant to prove modus operandi," it observed that Washington "failed to take the initiative to seek such limits." *Id.* Washington had only responded with a generalized objection to the state's *Spreigl* notice and did not seek to limit these "extraneous facts." *Id.* (quotations omitted). Washington did not submit a motion in limine to challenge the scope of the testimony although he could have "right up to the moment [the witness] testified." *Id.* Washington did not generally object when the witness testified to these facts at trial, and he did not request a curative instruction or that the testimony be stricken. *Id.* at 204–05. Ultimately, the court concluded that the district court was not obligated to sua sponte limit the scope of the witness's testimony. *Id.* at 205.

Holding these general principles in mind, we address Diriye's challenge to the scope of the bad-acts evidence here. Diriye filed no motion in limine before trial to limit the testimony surrounding the 2011 aggravated-robbery conviction. Although he contested admission of the *entire* episode at the pre-trial hearing, he made no attempt to limit the scope once the district court ruled it admissible. Moreover, he failed to object when the

16

now-challenged testimony arose, and he failed to request either a curative instruction or that the prejudicial extraneous facts be stricken. Accordingly, Diriye did not carry his burden of objecting to the scope of the testimony, and we reframe the issue as whether the district court erred by failing to sua sponte limit the testimony of the 2011 aggravated-robbery conviction. *See id.* at 205. We review this unobjected-to testimony for plain error. *Id.*

This court follows a three-prong test for plain error, which requires that, before an appellate court reviews an unobjected-to error, there must be (1) error, (2) that is plain, and (3) the error affected an appellant's substantial rights. *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998). The third prong of this test "is satisfied if the error was prejudicial and affected the outcome of the case." *Id.* at 741. The burden of persuasion on the third prong falls to the defendant, and this burden is a heavy one. *Id.*; *see also State v. Mosley*, 853 N.W.2d 789, 801–03 (Minn. 2014) (finding that, even assuming that plain error occurred, no relief was warranted because the defendant's substantial rights were not violated).

Applying these principles here, we need not determine whether plain error occurred because Diriye cannot show that his substantial rights were affected by the admission of the underlying facts of the 2011 aggravated robbery. First, we emphasize again that Diriye concedes on appeal that "evidence that Diriye had been convicted of and knew [D.B.] had implicated him in the April 2011 robbery was properly admitted."

Second, the record shows that the underlying facts of the 2011 aggravated robbery did not play a prominent role at trial. While two witnesses testified as to the sequence of events, this testimony was limited, and much more attention was given to D.B.'s actions

17

during the 2011 episode than to Diriye's. In opening statements and closing arguments for each side, Diriye's actions in the 2011 aggravated robbery received little focus.

Third, the record suggests that Diriye's counsel may have intentionally decided, as part of his trial strategy, not to object to the testimony. Throughout trial, Diriye's counsel emphasized many of the details of D.B.'s actions in the 2011 aggravated robbery episode to paint him as a "squealer," a "schemer," and an opportunistic liar, casting doubt on D.B.'s credibility. For the district court to sua sponte limit the testimony may have interfered with the defendant's trial strategy, which "would risk highlighting or enforcing rights that the defendant had, for tactical reasons, decided to waive." *Washington*, 693 N.W.2d at 205.

Fourth, admission of the 2011 aggravated-robbery episode through witness testimony—rather than through a certified copy of Diriye's conviction—may even have benefitted Diriye. The descriptive witness testimony left little room for speculation by the jury. Rather than simply hear that Diriye had been convicted of second-degree aggravated robbery, the jury heard mitigating testimony that Diriye used his finger instead of a weapon in committing the crime, Diriye was unsuccessful in his attempt to rob the victim, the police responded within minutes, and no harm came to the victim.

Finally, any prejudice arising from the jury learning about specific facts from the 2011 aggravated robbery was mitigated by the district court's cautionary instruction. *See State v. Ferguson*, 581 N.W.2d 824, 833 (Minn. 1998) (observing that the court assumes that the jury follows a district court's instruction).

In sum, because Diriye concedes that some evidence of the 2011 aggravated robbery was admissible, and he cannot show that any additional facts admitted describing the

18

circumstances of the robbery were so prejudicial as to have affected the outcome of the case, he cannot meet his heavy burden of showing plain error. Because Diriye was not entitled to a new trial, the district court properly denied Diriye's petition for postconviction relief.

**Affirmed.**