[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 197 
 SYLLABUS
1. The admission of 
Spreigl
 evidence of incidents that occurred 16 years prior to the charged offense was not an abuse of discretion in a criminal sexual conduct case where the defendant was incarcerated during more than half of the intervening time, there was significant similarity between the prior and charged acts and the defendant claimed that the victim was fabricating her complaints.
2. Once having determined that some testimony about prior bad acts was admissible as 
Spreigl
 evidence, the district court should exclude testimony of extraneous prejudicial facts that are not relevant to the purposes for the 
Spreigl
 evidence, but the district court is not required to do so 
sua sponte.

Affirmed.
 OPINION
Appellant Lionel Lee Washington was convicted of ten counts of criminal sexual conduct for sexually abusing his girlfriend's 15-year-old daughter, M.D. In affirming the conviction, the court of appeals held that evidence of a sexual assault that Washington had committed against a 15-year-old girl more than 16 years earlier was properly admitted as Spreigl evidence to prove a common modus operandi. State v. Washington, 2004 WL 1725753 at *4 (Minn.App. Aug.3, 2004). The court did not specifically address Washington's argument that the scope of the Spreigl
evidence was overbroad and included "extraneous" details that were more prejudicial than probative. We affirm.
In January 2002, M.D., then 17 years old, reported that 41-year-old Washington had sexually abused her between the winter of 2000 and October 2001. M.D. told a police investigator and a social worker that the first incident had occurred when Washington took her to a Saint Paul duplex and forced her to perform oral sex on him, as discipline and under the guise of teaching her how to do it properly. M.D. reported that the subsequent abuse, usually oral sex, occurred at the duplex and at her family's Cottage Grove apartment, where Washington lived for much of the relevant time. M.D. told investigators that Washington threatened that if she told anyone of the abuse, he would harm her, her mother and her two sisters. Sometimes he displayed a gun while making these threats.
Washington was charged in Washington County District Court with ten counts of criminal sexual conduct with a person younger than 18 years old. Minn.Stat. §§ 609.342, subd. 1(b), (g), (h)(iii); 609.343, subd. 1 (b), (g), (h)(iii); and 609.344, subd. 1(b), (e), (f), (g)(iii) (2004). The state served notice that it intended to offer Spreigl evidence that Washington had sexually abused two other females, ages 14 and 15, in 1982 and 1984. In connection with the 1984 incident involving the 15-year-old, Washington had pleaded guilty to third-degree criminal sexual conduct and first-degree tampering with a witness. No charges were pursued on the 1982 incident.
At a pretrial hearing, both victims of the 1982 and 1984 abuses testified that Washington had forced them to perform oral sex on him to teach them how to do it properly, required them to wash after each sexual assault, photographed them nude, threatened them with harm if they told anyone, and displayed a gun. M.K., the victim of the 1984 abuse, testified that Washington once had cut her neck with a knife. M.K. also said that while she was hospitalized and Washington was awaiting trial, he had assaulted her in the hospital and threatened further harm if she testified at his trial. M.K. did not volunteer information during the pretrial hearing about why she was in the hospital, and neither the attorneys nor the district court asked.
Before trial, the district court issued an order concluding that both Spreigl incidents were relevant and proven by clear and convincing evidence, and that the time gap did not bar admission because Washington had spent "substantial time" in jail or prison during the interval. The district court reserved ruling on the admissibility of evidence of these incidents until the *Page 199 
state had offered all of its non-Spreigl evidence at trial.
At trial, M.D. testified that the first incident of abuse occurred after she had sneaked out of her home to meet a boyfriend. M.D. was walking home when Washington directed her into his car, warned M.D. that her mother was "too upset" about M.D.'s behavior for her to go home, and then took her to a Saint Paul duplex where Washington forced her to perform oral sex on him, saying he would teach her how to do it properly. M.D. said that Washington confined her at the duplex for 3 or 4 days, forcing her to have sex approximately three more times. M.D. testified that trips to the duplex for sex continued through the spring of 2000. She said that Washington took nude photographs of her, told her she "could be a stripper, and dancer," and at one point forced her to drink alcohol and then penetrated her with a sex toy. M.D. testified that further incidents of abuse occurred at her home during evenings when her mother was at work and her two sisters were asleep. She said that she often was forced to bathe after sex, and that Washington sometimes displayed a gun as he threatened M.D. not to report the abuse.
M.D. testified that she revealed the abuse to her mother in March 2001, but that Washington accused M.D. of fabrication, and that the abuse resumed a month later. M.D. said she attempted suicide twice and that Washington counseled M.D.'s mother against taking M.D. for medical treatment, once commenting that M.D. likely would "make up some lie" when queried by health-care workers.
On the last day of the state's case in chief, the district court announced that it would admit M.K.'s testimony about the 1984 incidents "involving criminal sexual conduct as well as tampering with a witness incident" but it would exclude evidence of the 1982 abuse as cumulative. After the state had offered all of its non-Spreigl evidence, the court instructed the jury that it was about to hear evidence of a prior "occurrence," that the evidence was to be used only for "determining the state of mind, intent, motive, common scheme or plan, or lack of mistake which the defendant possessed on the dates charged in the complaint," and that using it to convict the defendant "might result in unjust double punishment."
M.K. then testified. M.K. told how she met Washington at an arcade on Hennepin Avenue in Minneapolis in 1984 and that Washington had another female show M.K. "the ropes" of prostitution. M.K. testified that she gave Washington the prostitution proceeds and lived at what she thought to be Washington's home. She testified that the first incident of abuse occurred when Washington taught her how to perform oral sex. M.K. testified that Washington "made" her take a shower so "there would be no trace" of the sex acts.
M.K. testified that over the next couple of months, she had sexual contact with Washington periodically. She said that she was forced to bathe after each occurrence, that Washington "had a gun and he threatened to kill" her if she disclosed the incidents, that he once put a gun in her mouth, and that he cut her throat with a knife. She also said that Washington photographed her in a "nightie," and that he continued to force her into prostitution. The abuse ended after M.K. escaped Washington's home and called a police officer who had once apprehended her as a runaway.
M.K. also testified about the contact she had with Washington while she was hospitalized. She said Washington had confronted her in the hospital, choked her, and warned her "not to show up in court or I would be dead, and not to testify." *Page 200 
The state asked why M.K. was hospitalized, and she responded: "From all the sexual stuff, the prostitution, I developed a disease called PID and I needed to have surgery." Washington did not object to that question or M.K.'s response. On cross-examination, Washington's counsel asked M.K.: "And you indicated you were in the hospital for a disease called CIV?" M.K. responded: "PID. It's not a disease, it's my ovaries were inflamed or my uterus was inflamed."
During redirect examination, the state asked permission for M.K. to display to the jury her neck scar from the knife injury she attributed to Washington. She displayed the scar without objection from Washington. Also on redirect, after answering a question about what had happened when she tried to flee Washington, M.K. testified unprompted: "That man destroyed my life. I can't even have children. I would just like to have one son." Washington objected to this testimony as nonresponsive and the district court sustained the objection. Washington did not move to strike the answer or seek a curative instruction and the court did not sua sponte order the testimony stricken or instruct the jury to disregard it.
The jury found Washington guilty on all counts. In affirming the conviction, the court of appeals held that M.K.'s testimony, while involving an incident that had occurred more than 16 years earlier, was admissible because Washington had spent "more than 50% of the intervening years [after his 1985 conviction] in prison" and he abused M.D. "in a manner similar to his abuse of M.K. in 1984." State v. Washington, 2004 WL 1725753 at *4. The court concluded that the Spreigl evidence effectively disproved Washington's claim that M.D. was fabricating the abuse to retaliate against his strict rules, and therefore the district court did not abuse its discretion by concluding that the evidence was more probative than prejudicial. Id. The court of appeals noted, but did not specifically address, Washington's complaint that "M.K.'s Spreigl testimony contained extraneous information." Id. at *3. We granted review solely on theSpreigl issues.[1]
 I
We first examine whether any part of the evidence about the 1984 incidents involving M.K. was admissible as Spreigl
evidence. Washington argues that the incidents were too remote to be relevant because they occurred more than 16 years prior to the last of the reported abuse of M.D. A district court's decision to admit Spreigl evidence is examined for abuse of discretion and the defendant bears the burden of proving that an error occurred and that the error was prejudicial. State v. Blom,682 N.W.2d 578, 611 (Minn. 2004).
Spreigl evidence is not admissible to prove that the defendant acted in conformity with his character, but is admissible for other purposes, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Minn. R. Evid. 404(b); State v.Spreigl, 272 Minn. 488, 139 N.W.2d 167 (1965). The overarching concern is that the evidence might be used for an improper purpose, such as suggesting that the defendant's prior bad acts show that he has a propensity to commit the present bad acts, or that the defendant is a *Page 201 
"proper candidate for punishment" for his past acts. State v.Billstrom, 276 Minn. 174, 179, 149 N.W.2d 281, 284-85 (1967).Spreigl evidence should "complete the picture" of a defendant, not "paint another picture." Ture v. State, 681 N.W.2d 9, 15-16
(Minn. 2004) (quotations omitted).
Given these special concerns surrounding use of Spreigl
evidence, the state bears the burden for securing its admissibility by (1) providing notice that the state intends to use the evidence, (2) clearly indicating what the evidence is being offered to prove, (3) offering clear and convincing proof that the defendant participated in the other offense, (4) proving that the Spreigl evidence is relevant and material to the state's case, and (5) proving that the probative value of theSpreigl evidence is not substantially outweighed by its potential for unfair prejudice. State v. Kennedy,585 N.W.2d 385, 389 (Minn. 1998); Minn. R. Evid. 403, 404(b).
Washington concedes that the state has met its burden as to prongs (1), (2), and (3) — specifically, that the state provided notice that the evidence was being offered to prove modus operandi and the state provided clear and convincing proof that the 1984 abuse occurred. He contends that the 1984 abuse was too remote to be probative of his modus operandi in 2001, and that any probative value was substantially outweighed by its potential for unfair prejudice.
The degree of proximity between the prior and charged acts, while bearing somewhat on the probative value analysis, is largely a factor in determining whether the Spreigl evidence is relevant to the prosecution. Blom, 682 N.W.2d at 612; State v.Wermerskirchen, 497 N.W.2d 235, 242 n. 3 (Minn. 1993). In general, the prior acts become less relevant as time passes. Thus, the greater the time gap, the more similar the acts must be to lessen the likelihood that the Spreigl evidence "will be used for an improper purpose." Ture, 681 N.W.2d at 15; seealso State v. Bolte, 530 N.W.2d 191, 198 (Minn. 1995) (15-year-old rape conviction not relevant in murder prosecution).
We decline to adopt a bright-line rule for determining when a prior bad act has become too remote to be relevant. Compare
Minn. R. Evid. 609(b) (evidence of witness' prior conviction generally inadmissible for impeachment purposes if more than 10 years have elapsed since date of conviction or release from confinement). Instead, "the preferred approach is for the trial court to focus on the closeness of the relationship between the other crimes and the charged crimes in terms of time, place and modus operandi." State v. Frisinger, 484 N.W.2d 27, 31 (Minn. 1992). Our review for abuse of discretion reflects the fact that the district court is best positioned to weigh those factors.State v. Johnson, 568 N.W.2d 426, 434 (Minn. 1997).
We confronted a similar time gap in State v. Rainer,411 N.W.2d 490, 493 (Minn. 1987), a case involving the murder of a woman the defendant had hoped to marry but who had indicated a desire to terminate the relationship. While excluding some prior acts that were not adequately supported by the evidence, the district court did admit six acts of violence attributable to the defendant, including five acts involving three prior wives, the oldest of which had occurred 16 to 19 years before the charged offense. Id. at 496. We held that the prior incidents, while not closely related in time to the charged offense, were admissible because they were "incidents of past violence, each one toward a significant woman in defendant's life (or someone closely associated with her), out of jealousy or anger, * * * [that] shows a repeating pattern of very similar *Page 202 
conduct not merely a general propensity toward violence." Id.
at 497. We noted that admissibility of the 16-year-old incident was bolstered by proof of intervening acts that had occurred 10 years and 2 years before the charged incident. Id.
Six years later, in State v. Wermerskirchen, we confronted an even greater time gap between the prior bad act and the charged acts. 497 N.W.2d at 237. We held that testimony about the defendant's fondling of his 13-year-old niece, 19 years before trial, was admissible in a prosecution charging the defendant with fondling his minor daughter because it "was highly relevant in that it showed an ongoing pattern of opportunistic fondling of young girls within the family context and, therefore, tended to disprove the defense that [the victim] was fabricating or imagining the occurrence of sexual contact." Id. at 242. Again, as in Rainer, the relevance of the oldest acts was bolstered by intervening acts. Id. at 237-38. We noted thatWermerskirchen, like Spreigl, involved charges of criminal sexual conduct involving a child — cases often complicated by matters of secrecy, vulnerability, lack of physical proof of the crime, and the credibility of child witnesses. Id. at 240-41 (citing 22 C. Wright and K. Graham, Federal Practice Procedure— Evidence § 5239 at 461-62 (1978)).
Two years after Wermerskirchen, we decided State v. Bolte
where we held that the district court erred in admitting a 15-year-old conviction for the rape of a woman in a prosecution for first-degree murder in which an unwanted homosexual advance was offered as the motive. 530 N.W.2d at 198. We noted that the prior conduct was not similar to the charged offense and therefore, "[g]iven the time lapse," was inadmissible. Id.
Most recently, in State v. Blom, we upheld admission of the defendant's prior kidnapping and sexual assault of two 15- and 16-year old women, which occurred 16 years before the kidnapping and murder of a 19-year-old woman. 682 N.W.2d at 601, 612. We held that even though the defendant had not been charged with sexual assault for the current incident, the district court did not abuse its discretion in admitting the Spreigl evidence because it "involved the kidnapping of young, petite women to remote, wooded areas * * * [and] subduing the women by applying force at their neck and throat areas." Id. We held that the lack of proximity in time, while "troubling," did not bar admission because the defendant had been incarcerated for 6 of the 16 years, and was incapacitated from committing such crimes while in prison. Id. at 612 n. 18.
These cases show that a district court, when confronted with an arguably stale Spreigl incident, should employ a balancing process as to time, place, and modus operandi: the more distant the Spreigl act is in terms of time, the greater the similarities as to place and modus operandi must be to retain relevance. They also show that concerns about acts that are remote in time are lessened where the defendant spent a significant part of that time incarcerated and other intervening acts tend to bolster the prior act's relevance and materiality. Such concerns are also lessened if the defendant was actually convicted of a crime based on the prior bad acts because the process of securing a conviction (i.e., obtaining a defendant's plea of guilty or gathering and presenting evidence at a trial) reduces the actual prejudice to the defendant of being required to defend against claims concerning acts that occurred years ago.
Balancing these factors in Washington's situation, we recognize that there are no intervening acts to bolster the relevance and materiality of the 16-year-old *Page 203 Spreigl evidence but we are persuaded that any concerns with the passage of time are outweighed by three facts: (1) Washington was actually convicted of the prior acts with M.K.; (2) he spent over one-half of the 16-year period incarcerated; and (3) the prior acts are strikingly similar in modus operandi to the charged acts. As to the latter, both victims were 15 years old, both were taught to perform oral sex and forced to bathe to eliminate evidence of sex, both were photographed nude or in provocative poses, and both were threatened with physical harm if they disclosed the acts. And evidence of modus operandi was relevant because Washington claimed that M.D. had fabricated her claims to retaliate against his strict ways.
Washington argues that the prior and charged acts are not sufficiently similar to overcome the time gap because there were some factual differences-Washington lived with M.D.'s family but "found" M.K. in a video arcade after she had run away from home; Washington did not force M.D. to work as a prostitute as he had done with M.K.; and Washington only threatened to physically harm M.D. but actually did harm M.K. But Spreigl evidence "need not be identical in every way to the charged crime." State v.Lynch, 590 N.W.2d 75, 81 (Minn. 1999).[2] We conclude, as did the district court and court of appeals, that the Spreigl
evidence reveals that Washington's modus operandi was to initiate sexual contact with teenage girls, train them to perform sexual acts on him, control them by threats and coercion, and encourage them to exploit their sexuality. Accordingly, the district court did not abuse its discretion in determining that some testimony about the abuse of M.K. was relevant as Spreigl evidence.
Even relevant and material Spreigl evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice. Kennedy, 585 N.W.2d at 389; Minn. R. Evid. 403, 404(b). Spreigl evidence "should be excluded where it is merely cumulative and a subterfuge for impugning [a] defendant's character." Billstrom, 276 Minn. at 179, 149 N.W.2d at 284. The number of Spreigl witnesses should be limited to guard against a perceived "retrial" of the prior case that might "fixate the jury on the defendant's guilt of the other crime." Ture,681 N.W.2d at 16.
The district court ruled that evidence of the 1984 abuse of M.K. was more probative than prejudicial, but that evidence of abuse of another victim, while relevant, was prejudicial because it was cumulative. By limiting the number of Spreigl incidents, the court properly guarded against admitting evidence that was unnecessary to the prosecution, that risked fixating the jury on prior incidents, and that might have treaded on the sometimes blurry line between proving modus operandi and impugning a defendant's character. See Ture, 681 N.W.2d at 16. The court's ruling on the admissibility of M.K.'s testimony also suggested an attempt to minimize any unfair prejudice by admitting testimony about "the incidents involving criminal sexual conduct as well as the tampering with a witness incident." Within those limits, the court's conclusion that the proposed evidence was more probative than prejudicial was not an abuse of discretion. *Page 204 
 II
Next, we address Washington's challenge to the scope of M.K.'s testimony. Washington concedes that there were "certainly some similarities" between the prior and charged acts, but argues that the district court should have excluded testimony of extraneous prejudicial facts, such as that M.K. was forced to work as a prostitute, that Washington cut her throat, that she contracted a pelvic disease, and that Washington's actions were responsible for her infertility.
We agree with the premise of Washington's argument, that the task of the district court to weigh probative value against prejudicial effect does not end with the preliminary decision to admit some Spreigl evidence. We have said that the district court should take "great care in limiting the [Spreigl] testimony so as to minimize the potential for unfair prejudice."State v. Harris, 560 N.W.2d 672, 678 (Minn. 1997). "When it is unclear whether Spreigl evidence is admissible, the defendant should be given the benefit of the doubt and the evidence should be excluded." State v. Johnson, 568 N.W.2d at 433.
But the defendant bears the burden of challenging the scope of the Spreigl evidence. For example, in Ture, we agreed with the defendant that having 24 witnesses testify as to a Spreigl
incident over nearly 3 days of a 12-day trial was "highly prejudicial," but we faulted the defendant for failing to object.681 N.W.2d at 16. We have said that the failure to object toSpreigl testimony constitutes waiver of the right to appeal unless (1) there was error, (2) the error was plain, and (3) the error affects the defendant's substantial rights. State v.Vick, 632 N.W.2d 676, 684-85 (Minn. 2001). If those three prongs are met, we may correct the error only if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." State v. Crowsbreast, 629 N.W.2d 433, 437 (Minn. 2001) (quoting Johnson v. United States, 520 U.S. 461, 466-67,117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)).
As in Ture, we agree with Washington that M.K.'s testimony should have been limited to exclude elements not needed or relevant to prove modus operandi. But, as in Ture, Washington failed to take the initiative to seek such limits. His response to the state's Spreigl notice contained a generalized argument against the admissibility of any Spreigl evidence and did not alternatively seek to limit what he now calls "extraneous" facts. Although 3 months elapsed between M.K.'s pretrial testimony and the start of trial, Washington did not submit a motion in limine to challenge the scope of M.K.'s testimony. We realize that the district court's Spreigl order came only 2 weeks before trial, but Washington could have challenged the scope of M.K.'s trial testimony right up to the moment she testified. See, e.g., Statev. Smallwood, 594 N.W.2d 144, 149 (Minn. 1999) (upholding the district court's grant of defendant's motion in limine brought after state's opening statement).
During trial, Washington did not object when M.K. testified about her forced prostitution, when the state asked permission for M.K. to display her neck scar, or when M.K. testified that she had been hospitalized for a pelvic disease that she contracted as a result of Washington's action. And Washington actually drew attention to the cause of M.K.'s hospitalization by clarifying the name of her disorder on cross-examination. Without specific objection to scope by the defendant, the situation is similar to that in State v. Vick, where we said that the district court had no "advance opportunity to consider the admissibility *Page 205 
of [the challenged Spreigl] testimony" and that the district court did not err by failing "to sua sponte strike the testimony or to provide a cautionary instruction."632 N.W.2d at 685.
Washington did object to M.K.'s unprompted testimony that Washington had "destroyed" her life, that Washington had made her infertile, and that she would "just like to have one son." The district court sustained Washington's objection to the testimony as nonresponsive, but Washington asserts that the court's general jury instructions immediately before the Spreigl testimony and at the close of trial were inadequate to mitigate the highly inflammatory nature of this testimony.
We agree that this evidence risked sending the improper message that Washington was "a proper candidate for punishment."Billstrom, 276 Minn. at 179, 149 N.W.2d at 284-85. But the burden was on Washington to request that it be stricken and that a specific curative instruction be given. State v. Jones,678 N.W.2d 1, 22 (Minn. 2004); State v. Darveaux, 318 N.W.2d 44, 49
(Minn. 1982); see also Rairdon v. State, 557 N.W.2d 318, 325
(Minn. 1996) (denying new trial because of counsel's "deliberate failure to object contemporaneously, and his decision not to pursue a motion to strike"). Further, if Washington believed the testimony was so fundamentally prejudicial, his remedy would be to request a mistrial.[3] See, e.g., Coralin v. State,377 N.W.2d 14, 16 (Minn. 1985) (defendant requested mistrial after challenging in-court identification elicited from Spreigl
witness); State v. Marsyla, 269 N.W.2d 2, 3 (Minn. 1978) (defendant requested mistrial after state introduced evidence not covered in Spreigl notice).
Because Washington did not move to strike, seek a curative instruction or request a mistrial, the question becomes whether plain error occurred when the district court, having sustained the objection to the testimony as non-responsive, did not actsua sponte to limit the testimony's impact by providing a curative instruction or to eliminate that impact by granting a mistrial. State v. Manley, 664 N.W.2d 275, 283 (Minn. 2003);State v. Baird, 654 N.W.2d 105, 113 (Minn. 2002); State v.Shoop, 441 N.W.2d 475, 480 (Minn. 1989). We conclude that plain error did not occur. We do not agree that the district court must, or even should, interfere with the trial strategy of the defendant. To act sua sponte here would risk highlighting or enforcing rights that the defendant had, for tactical reasons, decided to waive.
Washington was not barred from presenting exculpatory evidence or from cross-examining either M.D. or M.K. We cannot say that the failure of the court to act sua sponte in reaction to the challenged testimony affected a substantial right requiring a new trial. Accordingly, we hold that the district court did not err by failing sua sponte to limit the scope of M.K.'s trial testimony.
Affirmed.
[1] Washington also argued that his consecutive sentences of 30 years and 10 years in prison were disproportionate to the severity of the offense. The court of appeals remanded to the district court to reconsider the sentences in light of Blakelyv. Washington, 542 U.S. ___, 124 S.Ct. 2531, 159 L.Ed.2d 403
(2004). We do not consider any sentencing issues in this appeal.
[2] Although M.K.'s forced prostitution arguably has little relevance, it does bear some similarity to Washington's suggestions that M.D. be a stripper (both show financial exploitation) and, in any event, Washington did not specifically object to the testimony about prostitution.
[3] A district court may order a mistrial on its own motion, but its failure to do so is reviewed for abuse of discretion.State v. Long, 562 N.W.2d 292, 296 (Minn. 1997). *Page 206