*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1513**

State of Minnesota,
Respondent,

vs.

Demarcus Nasson Chaney,
Appellant.

**Filed August 31, 2015
Affirmed as modified
Cleary, Chief Judge
Concurring in part, dissenting in part, Hudson, Judge**

Hennepin County District Court
File No. 27-CR-13-24472

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Elizabeth R. Johnston, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Jessica Merz Godes, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Cleary, Chief Judge; Hudson, Judge; and Worke, Judge.

**CLEARY**, Chief Judge

Appellant Demarcus Nasson Chaney was charged with two counts of criminal sexual conduct in the first degree under Minn. Stat. § 609.342 (2012). The jury found appellant guilty. He appealed the admission of the other-acts evidence and the district court's discovery ruling and alleged prosecutorial misconduct during closing arguments. We affirm as modified and direct the district court to correct the "Warrant of Commitment" consistent with this opinion.

## FACTS

In June 2013, S.D. was out with two friends, H.K. and S.H., in the "Uptown" area of Minneapolis. The group was at a bar for about four hours and began walking towards a second bar around 1:15 a.m. By the time the group went to the second bar, S.D. was intoxicated. When the three friends arrived at the second bar, they discovered it was closed and went separate ways. H.K. went to a nearby gas station, and S.D. said she was going to a friend's house. About 15 minutes later, S.D. reappeared. According to H.K., S.D. appeared "disheveled, upset, crying" and had leaves and dirt in her hair. S.D. told H.K. that someone had beaten her up and taken her things. H.K. ran in the direction of the assault and returned to S.D. about five minutes later, at which point S.D. said that she had been raped at gunpoint in the alley and her possessions had been stolen. H.K. called 911 and the police took S.D. to the hospital.

At the hospital, a nurse performed a sexual-assault examination. S.D. told police that she was walking in an alley when she was approached by a black male, later identified as appellant. S.D. reported that appellant tried to make small talk with her before holding a small black gun to her head, threatening to kill her, and sexually assaulting her in an alley. S.D. provided the police with the number to her stolen phone. S.D.'s other possessions were temporarily lost but not stolen by appellant.

The police used S.D.'s cell-phone number to track the phone shortly after the attack. The phone "pinged" via GPS at a multi-unit apartment building a few blocks from the location of the assault. The police did not locate the phone at that time. However, the police later discovered that appellant lived with his mother at the apartment building where S.D.'s cell-phone had pinged the night of the attack. Shortly after the attack, S.D. gave a statement to the police that was mostly consistent with her statement at the hospital. But S.D. told the investigator that she did not remember whether the alleged assault took place at gun point. At trial, S.D. testified that appellant probably used a gun to threaten her. S.D. was unable to identify the location of the assault.

The police were eventually able to identify the location of S.D.'s phone at a house in South Minneapolis. The police picked up a suspect in possession of the phone, but discovered that the suspect had received the phone outside of World of Wireless in Uptown around lunchtime. The suspect provided a DNA swab that cleared him. The police went to World of Wireless and obtained a surveillance video that showed two males trying to sell a cell phone. The police could not identify the two individuals and

therefore released a photograph to the public. The release of the photograph led to the arrest of appellant and A.B.

After picking up the two suspects, the police showed S.D. a photographic line-up. S.D. identified A.B. as the person who assaulted her because she started "shaking" when she saw his photo. DNA testing from the vaginal swab matched appellant, not A.B. DNA testing from the fingernail swab revealed a mixture of two or more male individuals with the predominant profile matching appellant. A.B. also denied being in South Minneapolis at the time of the assault and his phone records indicated that he was in Northeast Minneapolis around the time of the assault.

The state charged appellant with two counts of criminal sexual conduct in the first degree. Before trial, the district court held a hearing to determine whether a prior conviction of appellant for aggravated robbery was admissible as other-acts evidence. In 1999, appellant broke into the apartment of a now husband and wife and stole money from them. After appellant took the money, appellant told the wife something to the effect of "it's your turn now." The husband interpreted appellant's statement to mean that he was going to sexually assault his wife. The husband and wife were able to escape the apartment.

The district court admitted the other-acts evidence for the stated purpose of establishing a "common scheme or plan" or determining "whether or not there was consent." Before the *Spreigl* witness testified at trial, the district court gave a cautionary

instruction telling the jury that it could only use the evidence in considering modus operandi and the absence of mistake or accident regarding consent.

At trial, S.D. testified that she believed that A.B. was involved in the assault. S.D. consistently stated—at the hospital, to investigators, and at trial—that only one person sexually assaulted her. S.D. also testified that she recalled having four to five drinks at the first bar, but then her memory gets "fuzzy." She testified to "being in a location that I don't know and I recall someone being on top of me and threatening me and forcing intercourse on me." An emergency room physician also testified at trial. He estimated that S.D.'s blood alcohol concentration would have been around 0.25 or 0.26 between 2:00 a.m. and 2:30 a.m. The doctor testified that an alcohol level of 0.25 would have an effect on the individual's level of consciousness and could result in memory loss or "a patchy memory of events."

During closing remarks, the state briefly referred to appellant as a "predator" and told the jury that it should not consider appellant's consent defense. The jury convicted appellant on both counts of criminal sexual conduct and this appeal followed.

### D E C I S I O N

### I.

Appellant first challenges the district court's order admitting evidence of a burglary he committed in 1999. The admissibility of *Spreigl* evidence lies within the sound discretion of the district court and will not be reversed absent a clear abuse of discretion. *State v. Spaeth*, 552 N.W.2d 187, 193 (Minn. 1996). "Evidence of another

crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith." Minn. R. Evid. 404(b). But 404(b) has an exception whereby such evidence is admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.*; *see also State v. Spreigl*, 272 Minn. 488, 491, 139 N.W.2d 167, 169 (1965). District courts must follow a five-prong test in determining the admissibility of other-acts evidence:

> (1) the state must give notice of its intent to admit the evidence; (2) the state must clearly indicate what the evidence will be offered to prove; (3) there must be clear and convincing evidence that the defendant participated in the prior act; (4) the evidence must be relevant and material to the state's case; and (5) the probative value of the evidence must not be outweighed by its potential prejudice to the defendant.

*Angus v. State*, 695 N.W.2d 109, 119 (Minn. 2005) (quotation omitted). If the admission of evidence of other crimes or misconduct is a close call, it should be excluded. *State v. Bolte*, 530 N.W.2d 191, 197 (Minn. 1995). Here, appellant challenges the second, fourth, and fifth prongs of the test. As to the second prong, the state offered the evidence to prove that S.D. did not consent to having sexual intercourse with appellant by establishing a common scheme or plan or by proving an absence of mistake or accident, both of which are valid exceptions to Rule 404(b). *Spaeth*, 552 N.W.2d at 195.

The disputed fact to which the *Spreigl* evidence would be relevant is whether S.D. consented to having sexual intercourse with appellant and forgot because of intoxication. We must determine whether the evidence of the 1999 burglary, by establishing a modus operandi or absence of mistake or accident, has a tendency to make more or less probable

6

the fact that S.D. did not consent to sexual intercourse with appellant. We conclude that the *Spreigl* evidence was not relevant and the district court erred by admitting it, but also hold that the error was harmless and does not require a new trial.

**A.**

The district court held the *Spreigl* evidence was relevant to establish a common scheme or plan because both cases involved a woman, a theft, and allegedly a gun to commit the crimes. The state argues that there is a marked similarity because both victims are young-adult females who were strangers to appellant, and appellant surprised the victims late at night. Neither the state's nor the district court's reasoning withstands close scrutiny.

The common scheme or plan exception "has evolved to embrace evidence of offenses which, because of their marked similarity in modus operandi to the charged offense, tend to corroborate evidence of the latter." *State v. Forsman*, 260 N.W.2d 160, 167 (Minn. 1977). In addition to the marked similarity to modus operandi, this court looks to the similarities of the time and place of the offenses in determining relevance. *State v. Ness*, 707 N.W.2d 676, 688-89 (Minn. 2006). Where the issue is a victim's consent in a sexual-assault case, "other-crime evidence show[ing] a pattern of similar aggressive sexual behavior by defendant against other women in the community" is "highly relevant." *State v. DeBaere*, 356 N.W.2d 301, 305 (Minn. 1984). The supreme court has found a marked similarity, for example, where the acts occurred within six months of each other, the time and place (the victim's bedroom) were identical, and the

defendant made sexual advances on his girlfriend's younger daughter. *State v. Kennedy*, 585 N.W.2d 385, 391 (Minn. 1998).

Here, there are almost no similarities in modus operandi. In the 1999 *Spreigl* act, appellant broke into the victims' apartment late at night, demanded money with a firearm, and then made comments to the wife that it was "her turn." The husband interpreted these actions and words to mean that appellant intended to sexually assault his wife, while appellant maintains that he was just there to steal money. The wife was able to escape from appellant and both victims ran away. The *Spreigl* act did not involve a sexual assault, nor was appellant ever charged with attempted sexual assault. In contrast, S.D. was very intoxicated and appellant took advantage of her inebriated state to force her into a dark alley and sexually assault her. S.D. was unable to confirm whether appellant used a gun, knife, or no weapon at all. Additionally, the location of the two acts is very different: the *Spreigl* act occurred in an apartment, whereas S.D. was sexually assaulted outside in an alleyway.

We also look to the time that elapsed between the two incidents in determining whether the other-acts evidence is relevant to establish a common scheme or plan. *State v. Washington*, 693 N.W.2d 195, 201 (Minn. 2005). "[W]hen confronted with an arguably stale *Spreigl* incident, [we] should employ a balancing process as to time, place, and modus operandi: the more distant the *Spreigl* act is in terms of time, the greater the similarities as to place and modus operandi must be to retain relevance." *Id.* at 202.

Approximately 15 years passed between the *Spreigl* act and the sexual assault. Appellant spent around eight of the 15 years in prison.

Because the *Spreigl* act is distant in time, there should be a greater similarity in terms of modus operandi. *Id.* However, as discussed above, the modus operandi of the two acts is not similar and appellant was never convicted of, or even charged with, attempted sexual assault in 1999. This case presents two crimes that are too distinguishable to establish a marked similarity, and the district court abused its discretion by relying on the common scheme or plan exception to admit the *Spreigl* evidence.

**B.**

The district court also erred by holding that the *Spreigl* evidence was relevant to prove an absence of mistake or accident in the sense of whether or not the victim consented. Appellant did not argue that he mistakenly thought that S.D. consented to sexual intercourse, and the state therefore had no reason to introduce evidence to rebut a non-existent defense. *See Ness*, 707 N.W.2d at 679 (rejecting absence of mistake justification for *Spreigl* evidence where defendant did not argue that he accidently touched a victim). To the extent that the evidence was admitted to dispute appellant's consent defense, the *Spreigl* evidence was properly analyzed under the common scheme or plan exception. *DeBaere*, 356 N.W.2d at 305 (admitting other sexual-assault evidence under an analysis of the common scheme or plan exception and not the absence of

mistake or accident exception). The district court therefore abused its discretion by relying on the absence of mistake or accident exception to admit the *Spreigl* evidence.

## C.

The district court held that the probative value of the *Spreigl* evidence outweighed the prejudicial effect "slightly." We disagree. The state's need for other-acts evidence should be addressed in balancing the probative value of the evidence against its potential prejudice. *Ness*, 707 N.W.2d at 690. Generally, the district court should wait until the state has presented all of its non-*Spreigl* evidence before making the final determination of the strength of the state's case. *Kennedy*, 585 N.W.2d at 392.

We have already concluded that the *Spreigl* evidence did not have a marked similarity in terms of modus operandi with the alleged crime. Because the evidence was not relevant, it only worked to prejudice appellant. *See Ness*, 707 N.W.2d at 689 (stating that "because the evidence was not relevant, the inherently prejudicial nature" of allegations of child abuse could only have prejudiced the defendant).

Even assuming that the *Spreigl* evidence had limited probative value, it would still be outweighed by the potential prejudice because the state had a strong case that S.D. did not consent. The district court found there was a need for the other-acts evidence because S.D. falsely identified the assailant. But the district court's concerns regarding identification were overstated given that DNA evidence from underneath S.D.'s fingernails and vaginal swab matched appellant.

10

The state also presented compelling direct and circumstantial evidence that S.D. did not consent to sexual intercourse: (1) S.D. unequivocally testified that she did not consent, (2) within minutes of the alleged assault, S.D. consistently told a friend, the police, and a nurse that she did not consent, (3) S.D. was emotionally distraught following the assault, and (4) S.D. had bruises on her body indicating that force was used, including marks on her face and arm. Based on the strength of the evidence, the *Spreigl* incident had less probative value in rebutting appellant's defense that S.D. consented and forgot.[1] *See id.* at 690 ("The prosecution's need for other-acts evidence should be addressed in balancing probative value against potential prejudice . . . .").

**D.**

For the final part of our *Spreigl* analysis, we have to determine whether the district court's error requires a new trial. We examine the whole record and determine "whether there is a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict." *Bolte*, 530 N.W.2d at 198 (quotation omitted). In determining whether the evidence significantly affected the verdict, we can consider the manner in which the evidence was presented, whether the district court gave a cautionary instruction, whether the state referenced the evidence in closing arguments, the strength of the state's other evidence, and any evidence appellant may have produced in defense. *Id.* at 198-99; *State v. Clark*, 738 N.W.2d 316, 347-48 (Minn. 2007). Almost all of these

---

[1] The district court also made the *Spreigl* ruling before the state presented all of its non-*Spreigl* evidence and did not reconsider it. If the district court had made the final *Spreigl* ruling at the preferred time, it might have decided to exclude the evidence based on the strength of the state's case.

factors weigh against finding that there is a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict.

The only factor favoring a new trial is the manner in which the state presented the other-acts evidence. The state presented the other-acts evidence by in-court testimony. The husband described how appellant robbed him and how he escaped with his wife before appellant could potentially sexually assault her. A police officer also testified that appellant admitted to committing the 1999 robbery. The in-court testimony was a prejudicial manner in which to present the other-acts evidence.

The remaining factors weigh against a new trial. Although the *Spreigl* evidence was presented at the end of the state's case-in-chief, the supreme court instructs district courts to make a determination on whether to admit other-acts evidence after the non-*Spreigl* evidence is presented. *Kennedy*, 585 N.W.2d at 392. This procedure necessarily means that the other-acts evidence, if admitted, will be presented at the end of the state's case. In order to mitigate the potential prejudice of the *Spreigl* evidence, the district court gave cautionary instructions before the state introduced it and during the final jury instructions. The state did not mention the *Spreigl* evidence during closing arguments.

Finally, given the DNA evidence against appellant, the only issue at trial was consent, but the evidence was strong on this issue. S.D. found her friend within minutes of the assault and told her that she had been sexually assaulted. S.D. told the police and nurses that she had been sexually assaulted as well. Multiple people testified as to S.D.'s

12

traumatized state following the assault, and S.D. had marks on her face and arm indicating that appellant had used force.

Given the strength of the evidence against appellant and other factors, there is not a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict and no new trial is required despite the district court's error.

**II.**

Appellant next argues that the prosecutor committed misconduct in closing arguments by referring to him as a "predator," by implying that the defense attorneys were predators, and by characterizing his defense as "old and tired." The state argued that it "colorfully, but acceptably" made a closing argument summing up the evidence and facts of the case. Appellant did not object to the closing arguments at trial.

The prosecutor and the defense have considerable latitude in closing arguments and can "analyze and explain the evidence, and . . . present all proper inferences to be drawn therefrom." *State v. Smith*, 541 N.W.2d 584, 589 (Minn. 1996). The state must refrain from making statements that will inflame the passions or prejudices of the jury. *State v. Duncan*, 608 N.W.2d 551, 556 (Minn. App. 2000), *review denied* (Minn. May 16, 2000). However, the state is free to argue that there is no merit to a defense in view of the evidence or no merit to a particular argument, so long as the prosecutor does not belittle a particular defense in the abstract. *State v. Salitros*, 499 N.W.2d 815, 818 (Minn. 1993).

Appellate courts use the plain-error doctrine when examining unobjected-to prosecutorial misconduct. *State v. Ramey*, 721 N.W.2d 294, 299 (Minn. 2006). Plain error exists if there is (1) an error, (2) that is plain, (3) and that affects the defendant's substantial rights. *State v. Washington*, 725 N.W.2d 125, 133 (Minn. App. 2006), *review denied* (Minn. Mar. 20, 2007). An error is plain if it "contravenes case law, a rule, or a standard of conduct." *Ramey*, 721 N.W.2d at 302. If the state engaged in prosecutorial misconduct, then the burden shifts to the state to show that appellant's substantial rights were not affected. *State v. Davis*, 735 N.W.2d 674, 681 (Minn. 2007). "Prosecutorial misconduct affects substantial rights if there is a reasonable likelihood that the absence of misconduct would have had a significant effect on the jury's verdict." *Id.* at 681-82.

## A.

Appellant first argues that it was prosecutorial misconduct for the state to refer to him as a "predator." The state counters that the term was properly used in the context of this case. While we believe that the use of the term "predator" in closing arguments is problematic, see *Duncan*, 608 N.W.2d at 556, we do not believe it was plain error given the facts. The victim was extremely intoxicated and less able to perceive or prevent a physical attack. H.K. testified that someone found S.D.'s cell-phone and returned it to her before the attack. The inference the state made was that appellant returned the phone and followed the girls until he could isolate one of them. Based on this evidence, the state argued that appellant acted as a predator when he followed and then sexually assaulted S.D. In light of the whole record and caselaw, referring to appellant as a

14

predator was not error. *See Smith*, 541 N.W.2d at 589 (allowing state to make proper inferences based on evidence). We reject appellant's second argument—that the state implied that his attorneys were predators during closing arguments—because it is unsupported by the record.

Appellant lastly argues that the state engaged in prosecutorial misconduct by characterizing his defense as "old and tried" and "blaming the victim." The state also told the jury that "[t]here is no need to go there," when referring to appellant's defense that the victim consented but forgot due to intoxication. In *Salitros*, the supreme court cautioned prosecutors against belittling a defense in the abstract; for example, by saying "[t]hat's the sort of defense that defendants raise when nothing else will work." 499 N.W.2d at 818. The supreme court said that it is "clearly improper" for a prosecutor to suggest that a defendant is raising a standard defense. *Id.* Here, the state discouraged the consent defense in the abstract by saying it is "old and tired" and literally telling the jury not to consider it. The state therefore committed prosecutorial misconduct.

**B.**

Because the prosecutor committed misconduct, the burden shifts to the state to show that appellant's substantial rights were not affected. *See Davis*, 735 N.W.2d at 681. We consider several factors in determining whether reversal is necessary because of prosecutorial misconduct during closing arguments.

First, the failure to object to comments or seek a curative instruction "weigh[s] heavily" against reversal because the district court might have been able to lessen the

15

effect of the improper prosecutorial argument. *State v. Washington*, 521 N.W.2d 35, 40 (Minn. 1994). Appellant did not object or seek a curative instruction regarding the state's closing arguments.

The district court's instructions to the jury are also relevant in determining whether the jury was unduly influenced by the state's comments. *Id.* The district court instructed the jury that it had to find beyond a reasonable doubt that the sexual penetration occurred without the consent of the victim. The district court further instructed the jury that if an attorney makes a statement of the law that is different from the law instructed by the court, the jury should disregard that statement. The district court's instruction undermined the state's remarks to the jurors that they should not consider appellant's consent defense.

Appellant also had a chance to rebut the state's remarks. In response to the state's closing remarks, appellant's counsel made clear that he was not blaming the victim but was arguing that the victim's memory was too unreliable to establish beyond a reasonable doubt that S.D. did not consent. Appellant's rebuttal lessened some of the prejudicial effect of the state's remarks. *See Davis*, 735 N.W.2d at 682 (stating that "whether the defendant had an opportunity to . . . rebut the improper suggestions" is one factor courts can use in examining prejudicial effect).

The improper comments were also a small part of the state's closing argument. The supreme court has relied on the fact that improper comments constitute a small portion of the arguments in holding that a defendant's rights were not significantly

affected. *See id.* (stating that the comments were not pervasive as they covered less than one of 64 pages of transcript); *Washington*, 521 N.W.2d at 40 (stating that remarks in four of 45 pages of transcript were not pervasive). The improper remarks cover less than one page of 19 pages of transcript of the closing remarks, which reduces their potential prejudicial effect.

Finally, we consider the strength of evidence against appellant. *Id*. This is not a "whodunit." The DNA confirms that appellant had intercourse with S.D. The physical evidence (scratches and bruises) and S.D.'s testimony, emotional state, and consistent statements to multiple people all provided the jury with compelling evidence that she did not consent to sexual intercourse with appellant. Although S.D. was very intoxicated at the time of assault, expert testimony established that an intoxicated person can remember certain parts of the night. Further, given S.D.'s high level of intoxication, it is arguable that she was incapable of giving consent. The strength of the evidence against appellant was strong, and the state met its burden of showing that the misconduct did not affect appellant's substantial rights.

Appellant argues that the cumulative effect of the *Spreigl* error and prosecutorial misconduct requires reversal. "Even if an error at trial, standing alone, would not be sufficient to require reversal, the cumulative effect of the errors may compel reversal." *State v. Houston*, 654 N.W.2d 727, 737 (Minn. App. 2003), *review denied* (Minn. Mar. 26, 2003). Given the strength of evidence in this case, the cumulative effect of the

17

harmless errors do not require a new trial. *See id.* (refusing to overturn conviction where multiple errors were harmless).

### III.

Before trial, appellant asked the state to produce a victim-witness advocate's notes summarizing any conversations with S.D. The district court found that the state had sufficiently complied with its discovery obligations. Appellant argues that the state failed to provide him with the victim-witness advocate's notes, and that the state had to provide him with the substance of conversations the state had with S.D. relating to the trial date.

Whether a discovery violation occurred is a question of law that this court reviews de novo. *See State v. Boldman*, 813 N.W.2d 102, 109 (Minn. 2012). Minn. R. Crim. P. 9.01, subd. 1(2), requires a prosecutor to disclose any of the following statements known to the prosecutor that relate to the case: "(a) written or recorded statements; (b) written summaries of oral statements; (c) the substance of oral statements."

Appellant first contends that the state failed to disclose the victim-witness advocate's notes summarizing conversations with S.D. The district court rejected this argument at trial after the state specifically asserted, on the record, that it had provided all summaries of any conversations with the victim. Appellant has not provided any evidence that the advocate had a conversation with S.D. that has not been produced.

Second, the district court incorrectly found that the state did not have to produce statements related to the case that deal with procedural matters. The correct standard for production under Rule 9.01 is any statement that relates to the case, without an exception

18

for conversations related to scheduling matters. There is, however, no need to remand because the state produced the necessary information at the hearing. The state clarified at the hearing that it "called the victim to tell her defendant decided her trial date." This disclosure satisfied Rule 9.01 because it provided appellant with the substance of previously undisclosed oral statements. Remand for an in-camera review of the witness advocate's notes is unnecessary.

## IV.

The final issue for this court to consider relates to the district court's sentencing order. The jury found appellant guilty of two counts of criminal sexual conduct in the first degree in violation of Minn. Stat. § 609.342. subd. 1(c), and Minn. Stat. § 609.342, subd. 1(e)(i). The conviction was based on the same course of conduct and the same victim. The district court issued a "Warrant of Commitment" stating that appellant was convicted of both counts but only sentencing him on one. Appellant argues that the district court erred by formally adjudicating him on both counts. The state counters that the use of the term "convicted" for both counts only refers to the jury's guilty verdict.

Minn. Stat. § 609.04 (2012) prohibits convictions on a crime charged and an included offense. Under section 609.04, "a defendant may not be convicted of two counts of criminal sexual conduct (different sections of the statute or different subsections) on the basis of the same act . . . ." *State v. Folley*, 438 N.W.2d 372, 373 (Minn. 1989). A conviction is defined as a verdict of guilty by a jury that is "accepted and recorded by the court." Minn. Stat. § 609.02, subd. 5 (2012). But "[a] guilty verdict

19

alone is not a conviction." *Spann v. State*, 740 N.W.2d 570, 573 (Minn. 2007). The supreme court has given the following instructions regarding the formal adjudication of guilty verdicts:

> [W]hen the defendant is convicted on more than one charge for the same act * * * the court [is] to adjudicate formally and impose sentence on one count only. The remaining conviction(s) should not be formally adjudicated at this time. If the adjudicated conviction is later vacated for a reason not relevant to the remaining unadjudicated conviction(s), one of the remaining unadjudicated convictions can then be formally adjudicated and sentence imposed, with credit, of course, given for time already served on the vacated sentence.

*State v. Pflepsen*, 590 N.W.2d 759, 766 (Minn. 1999) (quoting *State v. LaTourelle*, 343 N.W.2d 277, 284 (Minn. 1984)). We can look to the official judgment of conviction in the district court file as conclusive evidence of whether an offense has been formally adjudicated. *Pflepsen*, 590 N.W.2d at 767.

Here, the "Warrant of Commitment" lists both counts of criminal sexual conduct and lists corresponding dispositions of "Convicted" for both counts. The supreme court has specifically instructed district courts to include only the offense for which the defendant is being formally adjudicated guilty in the order. *See id.* We direct the district court to correct the "Warrant of Commitment" in a manner consistent with this opinion.

**Affirmed as modified.**

20

**HUDSON**, Judge (concurring in part, dissenting in part)

I concur with the majority's rule 9.01 discovery ruling and its determination that the district court erred by adjudicating Chaney on both counts of criminal sexual conduct in the first degree. But I respectfully dissent from the remainder of the majority opinion.

Criminal defendants have a due-process right to a fair trial and an impartial jury. U.S. Const. amends. VI, XIV; Minn. const. art. I, §§ 6, 7; *State v. Bowles,* 530 N.W.2d 521, 536 (Minn. 1995). That right includes a jury that will decide the case based upon properly admitted evidence and a jury whose passions have not been inflamed by extraneous matters and innuendo. Because of the cumulative effect of the evidentiary errors and the prosecutorial misconduct, Chaney was denied the right to a fair trial. Accordingly, I would reverse his conviction and remand for a new trial.

**Erroneous Admission of *Spreigl* Evidence**

As the majority opinion states, the district court abused its discretion in admitting the *Spreigl* evidence of Chaney's 1999 offense of burglary. The district court erroneously concluded that the *Spreigl* evidence was relevant to show a common scheme or plan. Chaney was charged with two counts of first-degree criminal sexual conduct. But the 1999 *Spreigl* act did not involve a sexual assault; indeed, Chaney was never even charged with sexual assault, let alone convicted of it. Thus, there was little similarity between the two crimes. Moreover, the *Spreigl* act was quite stale, given that nearly 15 years had passed between the *Spreigl* act and the sexual assault here. The *Spreigl* act was nothing more than classic character evidence proffered to show that Chaney had a propensity for violence. Stated otherwise: "He was a bad guy then, he must be a bad guy

now." Moreover, nothing about the facts of the *Spreigl* act shed any light on the issue of consent—the main issue in this case—because the prior act did not involve a sexual assault. Thus, the *Spreigl* evidence was completely irrelevant, had virtually no probative value, and was highly prejudicial as it moved the jury away from considering the facts of the case before them, to the improper consideration of Chaney's general character.

And if it was possible to exacerbate the prejudicial effect, the state did precisely that by putting the evidence in through the complainant-husband and the investigating police officer, rather than simply offering Chaney's record of conviction. Plainly, it was not the burglary conviction that the state wanted to get before the jury. Rather, it was the husband's belief that as part of the burglary, Chaney intended to rape husband's wife. Despite the egregiousness of this error, the majority concludes that given the strength of the evidence, among other things, admission of the *Spreigl* act did not significantly affect the verdict. I strongly disagree. First, the state's DNA evidence was irrelevant because Chaney's defense was consent. For her part, S.D. said she did not consent and told others that she did not consent. In the end, the jury had to decide whether to believe Chaney or S.D; and Chaney had the right to have that decision made based on the relevant evidence in *this* case, not on stale, unrelated evidence that he had committed a violent crime in the past. Secondly, although S.D. was distraught and had bruises on her body, suggesting that force was used, this was effectively a "he said – she said" case in which the jury had to weigh the respective credibility of the parties. Thus, the *Spreigl* evidence was extremely prejudicial to Chaney and denied him the right to have the consent issue decided solely on the relevant evidence of what happened on the night in question.

**Prosecutorial Misconduct**

As the majority notes, the state committed prosecutorial misconduct by characterizing Chaney's defense as "old and tried" and "blaming the victim." The supreme court has cautioned prosecutors against belittling a defense in the abstract or suggesting that a defendant is raising a standard defense. *State v. Salitros*, 499 N.W.2d 815, 818 (Minn. 1993). That is what the state did here. But I would conclude, contrary to the majority, that the state also committed misconduct by referring to Chaney as a "predator." The majority acknowledges that use of the term "predator" in closing argument is "problematic," but declines to hold that doing so is plain error given the facts of this case. But it is precisely because of the facts of this case that use of the term is much more than problematic. While it is true that S.D. was extremely intoxicated and therefore less able to perceive, prevent, or resist a physical attack, there is little in this record to suggest that Chaney took advantage of S.D.'s condition or that he was somehow lying in wait for her. To the contrary, a friend accompanying S.D. testified that Chaney was walking in the opposite direction of the women, passed them, and then called out to the women to tell them that one of them had dropped her cell phone. He gave them the phone and resumed walking away in the opposite direction. Nothing in the record supports the state's inference that Chaney turned around and followed the women until he could isolate one of them. Thus, the state's "colorful" characterization of Chaney as a predator is simply not supported by the evidence.

More importantly, the prosecutor embellished the "predator" characterization by repeatedly referring to Chaney as an animal who was seeking out his prey. Specifically,

the prosecutor stated that Chaney "noted this *pack* of intoxicated females," "[s]he's small, she's young," and "he was out there that night too and . . . he was watching and he was waiting in the dark for the right moment;" "and within moments . . . like a *predator, this man pounced and attacked upon her.*" (Emphasis added.) Later, the prosecutor repeated the argument: "Make no mistake. That night, on June 24th, Demarcus Chaney was a predator and [S.D.] was his prey." As a general matter, it is improper for a prosecutor to refer to a defendant as a "predator" because it serves no purpose other than to inflame the prejudices of the jury. *State v. Duncan*, 608 N.W.2d 551, 556 (Minn. App. 2000), *review denied* (Minn. May 16, 2000). And the misconduct is even more egregious when the defendant is characterized as a brute animal stalking his prey.[2] The prosecutor's remarks contravened clear caselaw, and therefore the misconduct was plain error. Because the prosecutor committed misconduct, the burden shifts to the state to show that Chaney's substantial rights were not affected. *State v. Davis*, 735 N.W.2d 674, 681 (Minn. 2007). On this record, the state did not meet its burden.

Criminal defendants have a constitutional right to be tried based upon the relevant evidence and reasonable inferences therefrom; not inflammatory innuendo. *State v. Harris*, 521 N.W.2d 348, 354 (Minn. 1994). "The prosecutor's closing arguments must not distract the jury from its proper role of deciding whether the state has met its burden."

---

[2] In addition, as appellant's counsel noted in her appellate brief, the racial overtones to the state's argument cannot be ignored given that Chaney is an African-American male and S.D. is a white female. Our supreme court has recognized that facially-neutral statements can in context raise serious questions of possible prejudice. *See State v. Varner*, 643 N.W.2d 298, 305 (Minn. 2002). Here, the prosecutor's use of the "predator-prey" analogy raises serious questions of possible prejudice implicating Chaney's due-process right to a fair trial.

*Duncan*, 608 N.W.2d at 555 (quotation omitted). Thus, prosecutors must continue to be mindful of the supreme court's admonition that "[t]he role of the prosecutor and trial court is not simply to convict the guilty, they are also responsible for providing a procedurally fair trial. Strong evidence of guilt does not—cannot—deprive a defendant of the right to a fair trial." *Harris*, 521 N.W.2d at 355.

**Cumulative Effect of Errors**

"Even if an error at trial, standing alone, would not be sufficient to require reversal, the cumulative effect of the errors may compel reversal." *State v. Houston*, 654 N.W.2d 727, 737 (Minn. App. 2003). The errors and prosecutorial misconduct committed here were not harmless, and they deprived Chaney of his right to a fair trial. Accordingly, I would reverse and remand for a new trial.